IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 08-21682-CV-KING-BANDSTRA

VALIDSA, INC. d/b/a DEXTON VALIDSA
and DEXTON, S.A., a Florida corporation,

        Plaintiff,

vs.

PDVSA SERVICES INC., a Delaware
corporation, and BARIVEN S.A., an agency or
instrumentality of a foreign state,

        Defendants.

_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon (i) Plaintiff, Validsa, Inc. d/b/a Dexton Validsa

and Dexton, S.A.'s ("Plaintiff['s]" or "Validsa['s]") Motion for Partial Summary Judgment as to

Liability Against Defendants ("Plaintiff's Motion") (D.E. 53);  (ii) Defendant, PDVSA Services

Inc.'s ("PSI['s]") Motion for Summary Judgment ("PSI's Motion") (D.E. 47);  and (iii)

Defendant, Bariven S.A.'s ("Bariven['s]") Motion for Partial Summary Judgment as to Counts I

and II of its Counterclaim and Counts IV and V of Plaintiff's Amended Complaint ("Bariven's

Motion") (D.E. 50), all filed on December 16, 2008. All discovery in the case  has been

completed in accordance with the Scheduling Order of July 7, 2008 setting a discovery deadline

of December 11, 2008.  At oral argument held on these cross-motions for summary judgment on

January 14, 2009, counsel for the parties advised the Court that notwithstanding the then

scheduling of this case for bench trial, no issues of fact material to the disposition of these

motions remained in dispute and this Court could proceed to resolve these motions purely as a matter of law.

After careful consideration of the written submissions and relevant case and statutory law, the Court grants Plaintiff's Motion and denies Defendants' Motions pursuant to Rule 56 Fed. R. Civ. P. and Local Rule 7.5, and enters a partial summary judgment in favor of Plaintiff as to liability on Counts I, II, III, IV and V of the Amended Complaint.

## I.     MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

### A.     The Parties.

Plaintiff, Validsa, is a Florida corporation that operates as an international food commodities trader, buying and selling food commodities such as beef, chicken, pork and black beans. (*See* Exhibit 1 – Am. Compl. ¶¶ 2, 9). Plaintiff's principals are Tomas Gonzalez and Pablo Cardenas. (*See* Joint Exhibit 9 – Gonzalez Dep. 15:5-20:5). Bariven is an agency and instrumentality of the Bolivarian Republic of Venezuela and is a wholly-owned subsidiary of Petróleos de Venezuela, S.A., the Venezuelan national oil company. (*See* Exhibit 1 – Am. Compl. ¶¶ 4, 10; Exhibit 2 – Answer ¶¶ 4, 10). PSI, a wholly-owned (100%) subsidiary of Bariven, is a Delaware corporation, headquartered in Houston, Texas. (*See* Exhibit 1 – Am. Compl. ¶¶ 3, 11; Exhibit 2 – Answer ¶¶ 3, 11; Exhibit 3 – PSI's Supp. Response to 2nd Int. No. 2). Georges Kabboul is the President and Chairman of the Board of Directors of both Defendants PSI and Bariven. (*See* Exhibit 3 – PSI's Supp. Response to 2nd Int. Nos. 1-2; Joint Exhibit 13 – Kabboul Dep. 12:25-13:20; 123:10-12).

Beginning in 2007, Bariven began purchasing food commodities in the international markets for consumption in Venezuela. (*See* Exhibit 1 – Compl. ¶ 12; Exhibit 2 – Answer ¶ 12; Joint Exhibit 13 – Kabboul Dep. 37:19-38:2; 50:13-51:23). Its subsidiary, PSI, was responsible

2

for and handled the operations for the purchases of food commodities outside of Venezuela. (*See* Joint Exhibit 13 – Kabboul Dep. 50:13-21; 51:12-18; 65:25-66:2).

### B.   The Contracts.

In November 2007, Defendants began purchasing food commodities from Plaintiff. (*See* Exhibit 1 – Am. Compl. ¶¶ 15-16; Exhibit 2 – Answer ¶¶ 15-16). The parties entered into eight contracts for the sale of food commodities in November 2007, three of which are at issue, and two contracts for the sale of food commodities in March 2008, both of which are at issue. For the five contracts at issue (the "Contract[s]"), Defendants submitted a purchase order for each, and Plaintiff submitted an acknowledgment for each. (*See* Exhibit 1 – Am. Compl. ¶1; Exhibit 2 – Answer ¶ 1).[1]

### 1.   The November 2007 Contracts.

The first Contract, based on Purchase Order No. 5100058326 and its Acknowledgment, was entered into in November 2007 and was for 5,000 metric tons of bovine beef at a unit price of \$4,928.58 per metric ton for a total value of \$24,642,900.00 ("Contract 326"). (*See* Exhibit 1 – Am. Compl. ¶¶ 26, 27, 64; Exhibit 2 – Answer ¶¶ 26, 27, 64). The second Contract, based on Purchase Order No. 5100058368 and its Acknowledgment, was entered into in November 2007 and was for 480 metric tons of whole chicken at a unit price of \$2,257.15 per metric ton for a total value of \$21,397,782.00 ("Contract 368"). (*See* Exhibit 1 – Am Compl. ¶¶ 31, 32, 68; Exhibit 2 – Answer ¶¶ 31, 32, 68). The third Contract, based on Purchase Order No. 5100058405 and its Acknowledgment, was entered into in November 2007 and was for 300

---

[1] The purchase orders for the Contracts reference the "Bariven, S.A. c/o PDVSA Services, Inc. Terms and Conditions", but those terms and conditions were never provided to Plaintiff and were not made a part of the Contracts because the terms and conditions applied to purchases made for the oil industry as opposed to purchases of food commodities. (*See* Joint Exhibit 10 – Gravina Dep. 14:22-15:23; Exhibit 12 – Gonzalez Decl. ¶¶ 3-6). PSI advised Plaintiff of the above and advised Plaintiff that the terms and conditions did not apply to purchase orders for food commodities. (Id.).

metric tons of ground beef at a unit price of $4,999.75 per metric ton for a total value of $1,499,925.00 ("Contract 405"). (*See* Exhibit 1 – Am. Compl. ¶¶ 36, 37, 72; Exhibit 2 – Answer ¶¶ 36, 37, 72).[2]

### 2. The March 2008 Contracts.

The fourth Contract, based on Purchase Order No. 5100061632 and its Acknowledgment, was entered into in March 2008 and was for 100,000 metric tons of refined sugar at a unit price of $446.92 per metric ton for a total value of $44,692,000.00 ("Contract 632"). (*See* Exhibit 1 – Am. Compl. ¶¶ 42, 43, 76; Exhibit 2 – Answer ¶¶ 42, 43, 76). The fifth Contract, based on Purchase Order No. 5100061757 and its Acknowledgment, was entered into in March 2008 and was for 24,000 metric tons of bovine beef at a unit price of $4,329.58 per metric ton for a total value of $103,909,920.00 ("Contract 757"). (*See* Exhibit 1 – Am. Compl. ¶¶ 51, 52, 82; Exhibit 2 – Answer ¶¶ 51, 52, 82).

In order to meet its obligations under Contracts 632 and 757, Plaintiff entered into supply contracts with Pacific Atlantic Trading Company ("PATC") and Quatro Marcos Ltda. ("Quatro Marcos"). (*See* Exhibit 5 – PATC Contract (D.E. 51-9); Exhibit 6 – Quatro Marcos Contract (D.E. 51-8)). Plaintiff was contractually obligated to pay PATC $29,500,000 for the purchase of 100,000 metric tons of sugar (*see* Exhibit 5 – PATC Contract (D.E. 51-9)),[3] and Quatro Marcos $87,600,000 for the purchase of 24,000 metric tons of beef (*see* Exhibit 6 – Quatro Marcos Contract (D.E. 51-8)).[4]

---

[2] There is a dispute as to whether Contract 405 was for the delivery of ground beef or canned beef, however, there is no dispute that Plaintiff delivered and Defendants accepted ground beef under the Contract. (*See* Joint Exhibit 6 – Cigana Dep. 87:3-22; Exhibit 4 – Gonzalez 2nd Decl. ¶¶ 14-16).

[3] To secure the supply contract with PATC, Plaintiff deposited $2,212,500 in an escrow account as a security deposit for the contract, and deposited $7,375,000 in an escrow account to secure the first shipment of sugar from PATC. (*See* Exhibit 7 – Plaintiff's Supp. Response 1st Int. No. 18).

[4] Plaintiff paid $2,000,000 to Quatro Marcos to secure the supply contract. (*See* Exhibit 7 – Plaintiff's Supp. Response 1st Int. No. 18). To supply Plaintiff with 24,000 metric tons of beef, Quatro Marcos had to make arrangements to

### 3. Analysis of the Contracts.

Upon receiving Plaintiff's acknowledgments of the purchase orders, Defendants were required to remit advance payments to Plaintiff calculated as a certain agreed-upon percentage of the total price of the purchase orders, respectively. (*See* Exhibit 1 – Am. Compl. ¶ 17; Exhibit 2 – Answer ¶ 17). For the March 2008 Contracts (Contracts 632 and 757), Plaintiff and PSI negotiated that the advance payments would equal thirty percent (30%) of the entire value of the contracts, respectively. (*See* Exhibit 1 – Am. Compl. ¶¶ 44, 53; Exhibit 2 – Answer ¶¶ 44, 53). Thus, the required advance payment for Contract 632 was $13,407,600, and the required advance payment for Contract 757 was $31,172,976. Plaintiff, however, was required to cause the issuance of performance bonds (known as Letters of Guarantee) from insurance companies in favor of PSI to secure the advance payments made by Defendants in the event that Plaintiff breached Contracts 632 or 757. (*See* Exhibit 4 – Gonzalez 2nd Decl., ¶4; Exhibit 9 – Letters of Guarantee (D.E. 73-9)).

Due to a delay that Defendants incurred in allocating funds, Defendants delayed remitting the advance payments under Contracts 632 and 757 to Plaintiff. (*See* Joint Exhibit 13 – Kabboul Dep. 99:11-101:22; Joint Exhibit 10 – Gravina Dep. 100:14-102:23). Defendants' delay in paying the advances under Contracts 632 and 757 extended Plaintiff's delivery obligations under the Contracts, as performance by Plaintiff and that of its food suppliers was not required to begin until the corresponding advances were paid. (*See* Joint Exhibit 10 – Gravina Dep. 100:14-102:23; Joint Exhibit 9 – Gonzalez Dep. 105:17-107:10; Joint Exhibit 13 – Kabboul Dep. 99:11-19; 100:19-101:17).

---

slaughter, butcher, freeze and package approximately 260,000 head of cattle. (*See* Exhibit 8 – Malutta Aff. ¶¶ 26-27). To do this, Quatro Marcos purchased additional weighing machines and additional equipment to handle beef, and entered into contracts to secure the necessary cattle. (Id.).

Defendants understood their delay in paying the advances would extend Plaintiff's delivery obligations under Contracts 632 and 757, and Defendants even recognized the effect the delays by late March 2008. (*See* Joint Exhibit 13 – Kabboul Dep. 95:9-101:22; Joint Exhibit 10 – Gravina Dep. 100:14-102:23). For example, on March 27, 2008, Mr. Kabboul sent an email stating that if the advances were not received by Plaintiff, Defendants could lose the deliveries of food. (*See* Joint Exhibit 13 – Kabboul Dep. 101:9-101:21). In addition, PSI's International Purchasing Supervisor, Alfonzo Gravina, sent an internal email stating: "I'm informing them that this is one of the reasons why we haven't been able to receive the delivery schedules. Until these [advance] payments, or L.C.'s, are received by the suppliers, they will not deliver those [delivery] schedules." (*See* Joint Exhibit 10 – Gravina Dep. 102:8-12).[5] Due to the size of the Contracts (i.e., the tonnage requirements), deliveries were made in installments. (*See* Joint Exhibit 13 – Kabboul Dep. 55:13-18). In general, Plaintiff and other suppliers would provide PSI with delivery schedules known as "cronogramas," indicating when and how future deliveries would take place. (*See* Joint Exhibit 10 – Gravina Dep. 92:8-93:17). The delivery schedules would occasionally change over time for reasons such as vessel availability, container availability, capacity at ports of call, production capacity and inspections. (Id.; Exhibit 11 – Rios Aff. ¶ 59). Upon receiving modified schedules, PSI would either accept the schedules and the changes made, request explanations as to changes, or challenge the changes. (*See* Joint Exhibit 10 – Gravina Dep. 92:8-93:17).

Upon delivery of partial shipments under the Contracts, Defendants were required to remit to Plaintiff the remaining balance for the corresponding shipment. (*See* Exhibit 1 – Am.

---

[5] Moreover, on March 28, 2008, after PSI inquired regarding the timing of deliveries under Contract 757, Plaintiff responded that it would not provide Defendants with a delivery schedule until the corresponding advance was received. (*See* Exhibit 10 – Gonzalez 3rd Decl., Exhibits C, D). In response, PSI did not assert that Plaintiff was late under the contract or demand an immediately delivery. Rather, PSI responded to Plaintiff's email by stating "Thank you!!!!!!!!" (Id.).

Compl. ¶ 18; Exhibit 2 – Answer ¶ 18). Specifically, PSI was obligated to pay for partial deliveries immediately upon the presentation of commercial invoices and the corresponding bills of lading, and in no event later than seven days after receipt of the requisite documents. (See Joint Exhibit 10 – Gravina Dep. 78:14-17; Joint Exhibit 1 – Alvarez Dep. 7:7-13; 12:6-17). Indeed, Maricarmen Alvarez de Hernandez, the head of accounts payable for PSI, explained at deposition:

> Q.   With respect to food shipments, when a partial shipment is received
>      pursuant to a purchase order, when – when is the payment made?
> A.   As soon as I receive the invoice and the bill of lading.
> Q.   And is that the standard practice with respect to food commodities?
> A.   Yes, sir.
> Q.   And would that be the case for Dexton?
> A.   Yes, sir.

(Joint Exhibit 1 – Alvarez Dep. 7:7-13).

> Q.   Okay. Now did you – when you say upon receipt of the bill of lading and
>      commercial invoice, would – well, what do you mean by regularly? Is it
>      immediate, upon receipt, or within a day or two --
>           MR. BONE:  Objection.
> A.   The normal process is seven days after receiving the invoice and bill of
>      lading. When it's complete and in order and – after one week, it was paid.
> Q.   Okay. So – and that was the case with Dexton?
> A.   Yes, sir.

(Id. at 12:6-17).[6]

Mr. Gravina testified that Defendants were late in making payments as of April 17, 2008:

> Q.   What is your understanding as to when the invoices became due?
> A.   *As per the contract*, they were due once the bill of lading and the
> invoicing
>      has been sent to PSI.
> Q.   Okay. So those – all those invoices that were past due, per Exhibit 13,
>      were for product where the product was already delivered?
> A.   That's –
>           MR. AUSTIN: Objection.

---

[6] Ms. Alvarez also transmitted an email to Plaintiff representing that the "frequent procedure" used for food suppliers was "[p]artial payments at 7 days against presentation of invoices and Bill of Lading." (See Exhibit 12 – Gonzalez Decl., Exhibit 7-e).

Q.     Correct?
A.     That's correct?
Q.     And where the bill of lading and the commercial invoice had already been
       sent to PSI.
A.     That's correct.
Q.     And prior to – prior to April 8th, do you know why those invoices were not
       being paid?
A.     No.
Q.     But they were late.
              MR. AUSTIN:  Objection.
Q.     Correct?
A.     Yeah.

(Joint Exhibit 10 – Gravina Dep. 78:14-79:9) (emphasis added).

**C.     The Dispute.**

During the course of performance, on April 15, 2008, Plaintiff received an email from

Paola Rivas, a PSI employee, that contained a string of email messages (the "Rivas Email").

(See Exhibit 1 – Am. Compl. ¶ 21; Exhibit 2 – Answer ¶21; Exhibit 13 – Rivas Email).  Included

in the string of email messages was an April 8, 2008 email message from Rafael Rosales, the in-

house legal advisor for Bariven, to various Bariven and PSI employees.  (See Exhibit 13 – Rivas

Email).  The email message stated: **"Per Mr. Georges Kabboul's instructions—effective**

**immediately—it is ordered that order No. 5100061757 be cancelled. . . .  [I]n any case, it is**

**instructed that any payment be suspended, should there be one."**  (Id.) (emphasis added).

Also included in the string of email messages was an April 8, 2008 message from Sulfani

Azocar, Bariven's food program coordinator, that stated: **"Per Mr. Georges Kabboul's**

**instructions, please proceed to cancel Purchase Order No. 5100061757 for 2400 [sic] MT of**

**beef placed with Empresa [Company] Dexton . . .  Likewise, it is instructed that any**

**pending payment to said company be suspended."**  (Id.) (emphasis added).[7]

---

[7] Mr. Gonzalez and Mr. Cardenas testified that the Rivas Email was predated by warnings given to Plaintiff by a
Venezuelan businessman named Juan Carlos Chourio who threatened that Plaintiff's contracts with Defendants would
be cancelled, and Defendants would cease doing business with Plaintiff, if Plaintiff refused to pay a $2,000,000 kickback
Mr. Chourio claimed was requested by Georges Kabboul (President of the Defendant corporations) and Luis Hernandez
(the head of Bariven's Brazilian subsidiary).  (See Joint Exhibit 9 – Gonzalez Dep. 111:18-113:2; 164:19-167:15; Joint

Upon receiving the Rivas Email ordering the cancellation of Contract 757 and suspension of payments to Plaintiff, Plaintiff sent a letter to Alfonzo Gravina and other PSI employees on April 17, 2008. (*See* Exhibit 1 – Am. Compl. ¶ 22; Exhibit 2 – Answer, ¶ 22; Exhibit 14 – April 17, 2008 Letter). Plaintiff's April 17, 2008 letter requested "an immediate[] written explanation of the situation" addressed in the Rivas Email, namely, the suspension of payments and the cancellation of Contract 757. (Id.).

Subsequently, on April 29, 2008, a meeting was held between PSI representatives and Georges Kabboul, President of both Bariven and PSI. (*See* Joint Exhibit 13 – Kabboul Dep. 161:25-162:7; 166:18-25). At the meeting, Mr. Kabboul informed Plaintiff that Defendants would not remit any additional payments to Plaintiff until all outstanding deliveries on pending contracts were made. (*See* Joint Exhibit 13 – Kabboul Dep. 167:21-24; 169:13-171:17). In addition, Mr. Kabboul informed Plaintiff that the payment terms for Contracts 632 and 757 were modified and demanded that Plaintiff deliver food commodities under the Contracts up to the amount of the advances made under the Contracts. Once advances were reduced to zero, Mr. Kabboul proposed Defendants would then pay Plaintiff for deliveries under Contracts 632 and 757 by way of letters of credit. (*See* Joint Exhibit 13 – Kabboul Dep. 174:22-176:21).

---

Exhibit 5 – Cardenas Dep. 140:7-141:9; 149:18-152:17). Mr. Chourio has a family connection with Bariven's third highest ranking officer, Eusebio Zavatti, who is a close confidant of Mr. Kabboul. (*See* Joint Exhibit 12 – Hernandez Dep. 47:24-48:6; Joint Exhibit 13 – Kabboul Dep. 106:14-23). Plaintiff contends that the Court need not consider the testimony regarding the representations made by Mr. Chourio to rule on Plaintiff's Motion because the Rivas Email and subsequent communications between the parties establishes that Plaintiff had reasonable grounds for insecurity to request adequate assurances of performance from Defendants. Defendants, however, have attempted to place in question whether Plaintiff had reasonable grounds for insecurity, and thus, Plaintiff's principals' state of mind comes into play. Accordingly, under Fed. R. Evid. 801(c), the representations made by Mr. Chourio may be considered, not for the truth of the matter asserted, but for the effect the representations had on the listener. *See United States v. Cruz*, 805 F.2d 1464, 1477 (11th Cir. 1986) (an out-of-court statement is not hearsay and may be admitted if it is offered "to show the effect it has on the hearer"); *Stewart v. Henderson*, 207 F.3d 374, 377 (7th Cir. 2000) (out-of-court statements were not-hearsay where offered not for the truth of the matter asserted but to demonstrate their impact on the listener's state of mind); *United States v. Giese*, 597 F.2d 1170, 1194 (9th Cir. 1979) (an out-of-court statement offered to show the "impact" on the listener is not hearsay); *Weaver v. Tech Data Corp.*, 66 F. Supp.2d 1258, 1265 (M.D. Fla. 1999) (an out-of-court statement offered not to prove the matter of the truth asserted, but "to establish the effect that the alleged hearsay statements had on the listener," is not hearsay).

Plaintiff rejected Mr. Kabboul's proposal seeking to withhold overdue payments and modify the payment terms under the Contracts. (*See* Joint Exhibit 13 – Kabboul Dep. 176:23-25; Joint Exhibit 9 – Gonzalez Dep. 129:3-19). And, on May 9, 2008, Plaintiff sent a letter to Defendants again asking for an explanation of the Rivas Email, requesting a retraction of the statements regarding the suspension of payments and the cancellation of Contract 757, and demanding "adequate assurances" (within five business days) that payment would be received for the multiple deliveries made under the Contracts as well as confirmation that Defendants would honor their commitments under Contracts 632 and 757. (*See* Exhibit 15 – May 9, 2008 Letter).

On May 16, 2008, PSI responded to Plaintiff's April 17, 2008 and May 9, 2008 letters stating that the Rivas Email was not intended for Plaintiff but nowhere did Defendants disavow its contents. (*See* Joint Exhibit 10 – Gravina Dep. 117:14-22; 119:12-19; Exhibit 16 – May 16, 2008 Letter). Defendants also failed to address Plaintiff's requests for assurances from Defendants. (Id.). On May 22, 2008, Plaintiff sent another letter to Defendants requesting a "concrete response" regarding outstanding payments that were past due and regarding the remaining deliveries due under the remaining Contracts. (*See* Joint Exhibit 9 – Gonzalez Dep. 143:20-144:11; Exhibit 17 – May 22, 2008 Letter).

On June 3, 2008, PSI responded to Plaintiff's May 22, 2008 letter with a proposed agreement for Plaintiff to sign. (*See* Joint Exhibit 9 – Gonzalez Dep. 148:2-149:2; Exhibit 18 – June 3, 2008 Email and Proposed Agreement). The agreement proposed multiple modifications to the Contracts, including a reduction of the amounts of payments owed, which Plaintiff rejected. (*See* Joint Exhibit 18 – Gonzalez Dep. 150:3-11; 151:1-11; 151:19-155:20).

On or before June 2008, Plaintiff completed all deliveries under Contracts 326, 368 and 405, and delivered 427 metric tons of bovine beef under Contract 757. (*See* Exhibit 10 – Gonzalez 2nd Decl. ¶ 14). Defendants accepted the deliveries and did not provide notice that any goods were rejected as non-conforming or late. (Id.; Joint Exhibit 10 – Gravina Dep. 112:23-113:1). Plaintiff provided Defendants with the commercial invoices and bills of lading for all deliveries made under the aforementioned Contracts. (*See* Exhibit 10 – Gonzalez 2nd Decl. ¶ 15).

Defendants have not paid approximately $1.55 million[8] in connection with deliveries of bovine beef they accepted under Contract 326. (*See* Exhibit 19 – Bariven Supp. Response Adm. No. 3; Exhibit 20 – PSI Supp. Response Adm. No. 3). Defendants have not paid $4,157,021.73 in connection with deliveries of chicken they accepted under Contract 368. (*See* Exhibit 19 – Bariven Supp. Response Adm. No. 4; Exhibit 20 – PSI Supp. Response Adm. No. 4). Defendants have not paid $62,487.96 in connection with deliveries of ground beef they accepted under Contract 405. (*See* Exhibit 19 – Bariven Supp. Response Adm. No. 5; Exhibit 20 – PSI Supp. Response Adm. No. 5). Defendants have not paid $1,298,821.11 in connection with deliveries of bovine beef they accepted under Contract 757. (*See* Exhibit 19 – Bariven Supp. Response Adm. No. 6; Exhibit 20 – PSI Supp. Response Adm. No. 6).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1259 (11th Cir. 2004); Fed. R. Civ. P. 56(c). The substantive law applicable to the case determines which facts

---

[8] Defendants claim the amount owed is $1,551,331, while Plaintiff claims the amount owed is $1,599,923.77. For purposes of this Order, which is only a determination of liability, such dispute does not raise a triable issue preventing summary judgment on liability.

are material. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991). Accordingly, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

The "movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Carrett*, 477 U.S. 317, 323 (1986). To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). According to the plain language of Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson*, 477 U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-

moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249-50.

## III.   ANALYSIS

The Court is here on the parties' cross motions for summary judgment. Plaintiff's Motion seeks a finding of liability against Defendants on all five Counts of the Amended Complaint.[9] In addition, Plaintiff seeks summary judgment dismissal of Bariven's counterclaims.[10] Bariven's Motion seeks summary judgment on Counts I and II of its Counterclaim, and summary judgment dismissal of Counts IV and V of Plaintiff's Amended Complaint. Finally, PSI's Motion seeks summary judgment dismissal of the Amended Complaint asserting it is not liable under the Contracts.

### A.   Defendants Breached Contracts 326, 368, 405, and 757 by Failing to Pay for Goods Delivered Under the Contracts.

Plaintiff's breach of contract claims under Counts I, II, III and V of the Amended Complaint are grounded in Article 2 of the Uniform Commercial Code ("UCC") as adopted in Florida. *See* Fla. Stat. § 672.102. Specifically, Plaintiff cites to Fla. Stat. § 672.607(1), which provides, "[t]he buyer must pay at the contract rate for any goods accepted." Goods are considered accepted where the buyer, after having a reasonable opportunity to inspect the goods, fails to make an effective rejection of the goods as required under Fla. Stat. § 672.602(1). *See* Fla. Stat. § 672.606(b).

---

[9] The Amended Complaint contains five breach of contract claims, one claim for each Contract. Count I is brought under Contract 326. Count II is brought under Contract 368. Count III is brought under Contract 405. Count IV is brought under Contract 632. And, Count V is brought under Contract 757.

[10] Bariven's Counterclaim contains seven claims. Counts I and II are breach of contract claims under Contracts 632 and 757, respectively. Counts III and IV are unjust enrichment claims under Contracts 632 and 757, respectively. Counts V and VI are breach of the implied covenant of good faith, fair dealing, and commercial reasonabless claims under Contracts 632 and 757, respectively. And, Count VII is an equitable accounting claim.

Here, it is undisputed that Plaintiff completed all of its deliveries under Contracts 326, 368 and 405, and Defendants accepted all of the goods delivered under those Contracts. (*See* Exhibit 10 – Gonzalez 2nd Decl. ¶¶ 14, 16). Plaintiff delivered approximately 427 metric tons of beef under Contract 757, and Defendants accepted that delivery as well. (Id.). Defendants did not provide Plaintiff with any notice that the goods delivered under the Contracts had been rejected for any reason.  (Id.; Joint Exhibit 10 – Gravina Dep. 112:23-113:1).   Finally, Defendants were required to remit payments to Plaintiff for partial deliveries made under the Contracts, and Plaintiff submitted to PSI the commercial invoices and corresponding bills of lading for each of the deliveries made under Contracts 326, 368, 405, and 757. (*See* Exhibit 1 – Am. Compl. ¶ 18; Exhibit 2 – Answer ¶ 18; Exhibit 10 – Gonzalez 2nd Decl. ¶ 15).

Notwithstanding the above, Defendants failed to pay Plaintiff the full contract price for the goods Plaintiff delivered and that Defendants accepted under these Contracts.  Specifically, Defendants failed to pay Plaintiff approximately $1.55 million for beef delivered and accepted under Contract 326, $4,157,021 for chicken delivered and accepted under Contract 368, $62,487 for ground beef delivered and accepted under Contract 405, and $1,298,821 for beef delivered and accepted under Contract 757. (*See* Exhibit 19 – Bariven Supp. Response Adm. Nos. 3-6; Exhibit 20 – PSI Supp. Response Adm. Nos. 3-6).  Moreover, Defendants offer no defense or explanation for their failure to pay for the goods delivered.[11]  Defendants' failure to pay for goods accepted under Contracts 326, 368, 405 and 757 thus constitutes a  material breach of the

---

[11] At the hearing on the summary judgment motions, Defendants argued that Contracts 326, 368 and 405 called for immediate delivery (*see* D.E. 79 – Hearing Transcript, pp. 33-34), a claim Plaintiff disputes (*see* D.E. 76 – Plaintiff's Reply in Support of Plaintiff's Motion, pp. 5-7).  To the extent this raises a disputed fact, it is non-material when Defendants proceeded to accept all the shipments under these Contracts without objection and without ever placing Plaintiff on notice of breach.  Upon acceptance, a buyer must give notice of breach or be barred from any remedy. Fla. Stat. § 672.607(3)(a); *Nebula Glass Int'l Inc. v. Reichhold, Inc.*, No. 02-60703-CIV, 2004 WL 4946483, at *5 (S.D. Fla. Apr. 27, 2004); *Gen. Matters, Inc. v. Paramount Canning Co.*, 382 So. 2d 1262, 1263-64 (Fla. 2d DCA 1980).  Simply put, Defendants could not accept the benefits of these Contracts and later choose to claim breach after litigation commences.

contracts. *See Lockheed Martin Corp. v. Galaxis USA, LTD*, 222 F. Supp. 2d 1315, 1324 (M.D. Fla. 2002) (the UCC provides that a purchaser's "failure to pay for goods 'accepted' constitutes a breach of a sales contract") (citing Fla. Stat. §672.601(1)). Accordingly, Plaintiff is entitled to summary judgment on its breach of contract claims under Contracts 326 (Count I), 368 (Count II), 405 (Count III) and 757 (Count V).

### B. Defendants Anticipatorily Repudiated Contracts 632 and 757.

Plaintiff's anticipatory repudiation claims under Counts IV and V of the Amended Complaint are also grounded in Article 2 of the UCC as adopted in Florida. Applying Article 2 to the facts, Defendants anticipatorily repudiated Contracts 632 and 757 by failing to provide Plaintiff with adequate assurances that Defendants would remit payments to Plaintiff for certain deliveries made under the Contracts and that Defendants would honor their obligations under Contracts 632 and 757.

#### 1. Plaintiff Had Reasonable Grounds for Insecurity to Request Adequate Assurances.

The UCC allows a party to demand adequate assurance of due performance of a contract when the party has "reasonable grounds for insecurity" with respect to the performance of the other party to the contract. *See* Fla. Stat. § 672.609(1). Specifically, Section 672.609(1) states:

> A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he or she receives such assurances may if commercially reasonable suspend any performance for which he or she has not already received the agreed return.

*See also Alimenta (U.S.A.), Inc. v. Gibbs Nathaniel (Can.) Ltd.*, 802 F.2d 1362, 1366 n.10 (11th Cir. 1986) (quoting identical provision adopted in Georgia). When dealing between merchants, as here, "commercial standards" determine whether a party has reasonable grounds for

15

insecurity. *See* Fla. Stat. § 672.609(2).[12]  "Under commercial standards and in accord with commercial practice, a ground for insecurity need not arise from or be directly related to the contract in question."  Fla. Stat. § 672.609 cmt. n.3; *see also Clem Perrin Marine Towing Inc. v. Pan. Canal Co.*, 730 F.2d 186, 189 (5th Cir. 1984) ("A ground for insecurity need not arise from or be directly related to the contract under which a party suspends performance").

The undisputed facts establish that Plaintiff had more than reasonable grounds for insecurity with respect to Defendants' performance under the Contracts.  Plaintiff's principals, Tomas Gonzalez and Pablo Cardenas, have given unrebutted testimony that they were approached by Venezuelan businessman, Juan Carlos Chourio, in March 2008, who demanded a kickback from Plaintiff in order for Plaintiff to keep its Contracts in place with Defendants. (*See* Joint Exhibit 9 – Gonzalez Dep. 111:18-113:2; 164:19-167:15; Joint Exhibit 5 – Cardenas Dep. 140:7-141:9; 149:18-152:17).  Mr. Chourio informed Mr. Gonzalez during the second week of April 2008 that because Plaintiff refused to pay the kickback, Defendants were pulling their Contracts with Plaintiff. (Id.).  Defendants do not dispute the conversations; they dispute that Mr. Chourio was acting as their agent or on the instructions of President Kabboul or Luis Hernandez (the head of a Bariven subsidiary located in Brazil).  Defendants admit, however, that Mr. Chourio has a familial connection with Bariven's third highest ranking officer, Eusebio Zavatti, who Messrs. Kabboul and Hernandez described as a close confidant of Mr. Kabboul. (*See* Joint Exhibit 12 – Hernandez Dep. 47:24-48:6; Joint Exhibit 13 – Kabboul Dep. 106:14-23).

---

[12] Here, the parties are all merchants under the UCC as they all dealt in the sale and purchase of food commodities. *See* Fla. Stat. § 672.104(1) (defining "merchant" as a "a person who deals in goods of the kind"); Fla. Stat. § 672.104(3) (defining transactions "between merchants" as "any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants").

While these facts show Plaintiff had reasonable grounds for insecurity to request adequate assurances from Defendants with respect to their obligations under the Contracts, the Court does not need to rely on them for its determination. This is so because the Rivas Email Plaintiff received from PSI on April 15, 2008, taken alone, would have given a reasonable merchant grounds for insecurity. (*See* Exhibit 13 – Rivas Email). The Rivas Email contained a subject header that referenced the cancellation of Contract 757 and also contained a string of email messages, two of which relayed instructions from Mr. Kabboul to cancel Contract 757 and suspend all payments to Plaintiff. (Id.) Those two email messages, dated April 8, 2008, came from the head of Bariven's food procurement program and from Bariven's in-house counsel, respectively. (Id.) There is no dispute that the Rivas Email chain was sent to Plaintiff and that Plaintiff received it on April 15, 2008. (*See* Exhibit 1 – Am. Compl. ¶ 21; Exhibit 2 – Answer ¶ 21).

Defendants' claim that the email messages in the Rivas Email were inadvertently forwarded to Plaintiff and were intended to be kept internally so it does not serve to raise a factual dispute. (*See* D.E. 65 – Defendants' Opposition to Plaintiff's Motion, p. 5). Specifically, Defendants claim that "internally to Bariven there was unhappiness with [Plaintiff's] performance and . . . there was an e-mail message chain that was inadvertently forwarded that included some discussion . . . where one person at Bariven was saying *'we ought to cancel'*." (*See* D.E. 79 - Hearing Transcript, pp. 40-41) (emphasis added). But the undisputed facts show much more. Whether or not the email messages were meant to be kept private, they were not. They were received by Plaintiff and contained alarming information. The plain language contained in the emails shows more than one person's opinion on whether there ought to be a

cancellation; it shows an immediate instruction to cancel Contract 757 and suspend any payments due Plaintiff. Indeed, the emails stated:

> Per Mr. Georges Kabboul's instructions, *please proceed to cancel* Purchase Order No. 5100061757 for 2400 MT of beef placed with Empresa Dexton . . . Likewise, *it is instructed that any pending payment to said company be suspended* . . . .

> Per Mr. Georges Kabboul's instructions—*effective immediately—it is ordered* that order No. 5100061757 be *cancelled* . . . . in any case, *it is instructed that any payment be suspended*, should there be one.

(*See* Exhibit 13 – Rivas Email) (emphasis added). This was more than a communication that Defendants "ought" to cancel Contract 757 and suspend payments. This was an *instruction* to do so.

Whether Defendants intended that these email messages be forwarded to Plaintiff is irrelevant. What is relevant is that Plaintiff received the email messages from PSI, and the email messages contained express instructions from Mr. Kabboul to cancel Contract 757 and suspend all payments to Plaintiff (there is no dispute that Defendants stopped making payments to Plaintiff at this time). The language contained in the email messages would lead any reasonable recipient to believe that Defendants cancelled Contract 757 or that at the very least such cancellation was imminent.[13] Furthermore, Defendants remained silent as to the accuracy of those cancellation instructions, and such silence can reasonably be interpreted as confirmation of what the e-mail stated.

The Court disagrees with Defendants that a reasonable person, let alone a reasonable merchant, would not have grounds for insecurity upon receiving such an email. To the contrary, the quoted language, standing alone, would suffice to give any seller of goods reasonable

---

[13] Similarly, while Defendants dispute that Contract 757 was cancelled (Defendants' witnesses gave conflicting testimony on this point), this too is not relevant to the Court's determination as to whether reasonable grounds for insecurity were present for the same reasons indicated above.

grounds for insecurity. Plaintiff had already entered into contracts with suppliers to fulfill its obligations under the Contracts, and Plaintiff was contractually obligated to pay its suppliers over $117 million for the goods covered under Contracts 632 and 757. Thus, if the instructions in the email were followed (and there is nothing in the record to show Plaintiff had any reason not to believe that the instructions would not be followed) and Contract 757 was cancelled, and all payments to Plaintiff suspended, Plaintiff faced considerable monetary exposure to its suppliers. This is an additional fact that gave Plaintiff reasonable grounds for insecurity.

Defendants also argue that Plaintiff had no grounds for insecurity because Defendants had already advanced payments to Plaintiff under Contracts 632 and 757. The advancement of funds does not preclude a finding that Plaintiff has shown undisputed evidence of reasonable grounds for insecurity. First, Plaintiff was dealing with an agency of a foreign government under the direction and control of the very person who had issued the instructions to cancel the contract and suspend any payments, and which, with its resources and autonomy, could stop paying Plaintiff at any time if it decided to do so. Second, the advance payments Plaintiff had received were secured by performance bonds issued by insurance companies in favor of PSI (*see* Exhibit 9 – Letters of Guarantee (D.E. 73-9)), thus reducing, if not eliminating, any comfort Plaintiff may have had by the fact that Defendants had already advanced funds.

If these facts are not enough, Plaintiff, upon receiving the Rivas Email, had independent grounds for insecurity due to the fact that Defendants were already past due in payments to Plaintiff. Where a buyer falls behind on its account with the seller, as Defendants did here, even if the late payments involve separate and legally distinct contracts, the seller has grounds for reasonable insecurity of the buyer's due performance. *See* Fla. Stat. § 672.609 cmt. n.3; *see also Nat'l Farmers Org. v. Bartlett and Co., Grain*, 560 F.2d 1350, 1355 (8th Cir. 1977) (where the

19

buyer was past due, the seller had commercially reasonable grounds for insecurity and could avail itself of Section 2-609); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 568 (10th Cir. 1989) (granting summary judgment because no rational trier of fact could find there were no reasonable grounds for insecurity).

There is no dispute that on April 8, 2008, in line with Mr. Kabboul's instructions contained in the Rivas Email, Defendants stopped making payments to Plaintiff on its invoices. (*See* Joint Exhibit 1 – Alvarez Dep. 9:11-10-3; Joint Exhibit 10 – Gravina Dep. 78:5-13). By this date, Plaintiff had delivered commercial invoices and bills of lading for approximately $5 million worth of food commodities that had been delivered to and accepted by Defendants, and payments for those deliveries were due immediately, and in no event later than seven days after the presentment of the commercial invoices and the corresponding bills of lading. (*See* Exhibit 10 – Gonzalez 2nd Decl. ¶6; Joint Exhibit 1 – Alvarez Dep. 7:7-13, 12:6-17; Joint Exhibit 10 – Gravina Dep. 78:14-17). Thus, by April 17, 2008, when Plaintiff first requested adequate assurances, Defendants had fallen behind on payments to Plaintiff in excess of $5 million for invoices submitted to PSI under Contracts 326, 368, and 405. (*See* Exhibit 10 – Gonzalez 2nd Decl. ¶6).[14]

---

[14] Attempting to create a disputed issue of fact, Defendants contend they were not late in making payments as of April 17, 2008 because they had a thirty day, not a seven day period, to pay from the day the documents were presented. (*See* D.E. 65 – Bariven's Opposition to Plaintiff's Motion, p. 14). In support, Defendants filed an affidavit executed by Ms. Alvarez to cover (and contradict) an issue that was fully covered by her prior deposition testimony. (*See* D.E. 66-13; Alvarez Aff. ¶ 2). In addition to the fact that Ms. Alvarez's affidavit contradicts her prior testimony, the affidavit is contradicted by the very purchase order Ms. Alvarez references, attaches and relies on in her affidavit. Specifically, while the last page of the purchase order provides that standard invoicing is "100% net 30 days after receipt," it also states this is the case "*unless otherwise specified in this Purchase Order*." (*See* D.E. 66-13; Alvarez Aff. ¶ 2) (emphasis added). Ms. Alvarez's affidavit fails to disclose that the purchase order indeed specifies otherwise at the first page, where it states: "PAYMENT TERMS: Payable immediately Due net CURRENCY: USD." (*See* D.E. 66-13; Alvarez Aff. ¶2). Additionally, Ms. Alvarez offers no explanation in her affidavit as to why her testimony has changed regarding when payment was due. Because her affidavit statements are contradicted by her prior deposition testimony and by the very purchase order attached thereto, the affidavit is disregarded as a sham. *See Stevens v. Simplexgrinnell*, 190 F. App'x 768, 2006 WL 1914247, *2 (11th Cir. July 11, 2006) (finding the district courts "may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation") (citation omitted); *Akins v. Fulton County, Georgia*, 279 F. App'x 964, 2008 WL 2130748, *3 (11th Cir. May 22, 2008) ("Under the sham affidavit concept, '[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with

In light of the foregoing, Plaintiff had a number of reasons to have reasonable insecurity as to whether Defendants would honor their obligations under the Contracts. While Defendants cite to *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003 (10th Cir. 2002), to support their claim that Plaintiff did not have reasonable grounds for insecurity, their reliance on *Lantec* is misguided. In *Lantec*, the court did not face a situation where one party requested adequate assurances, and thus, it did not need to make a determination as to whether that party had reasonable grounds for insecurity to demand such assurances. To the contrary, plaintiffs accused the defendant of repudiating the contracts with no request for adequate assurances having been made. *Id.* at 1014-16. There, the court found that the defendant did not repudiate the contracts by merely informing the plaintiffs that it "wanted" to terminate the contracts, because instead of providing the plaintiffs with written notice of termination (as required under the contracts), the defendant did the opposite – it sent the plaintiffs a letter explaining that the contracts were not terminated. *Id.* at 1015.

In contrast to the facts in *Lantec*, Plaintiff received more than a mere communication that Defendants "wanted" to cancel Contract 757; rather, Plaintiff received the Rivas Email that contained email messages instructing Defendants to cancel Contract 757 and suspend payments whether or not related to that contract. Moreover, Defendants stopped making payments on April 8, 2008 and never made any further payments thereafter. After learning of the above, Plaintiff immediately requested adequate assurances from Defendants that they would honor the Contracts, something the plaintiffs in *Lantec* did not do. And unlike *Lantec*, Defendants never wrote to Plaintiff explaining that the contracts were not terminated and that payments would be

an affidavit that merely contradicts, without explanation, previously given clear testimony.'") (citation omitted). In any event, besides the lateness of these payments (which were never made), there are, as the Court noted, other sufficient grounds for insecurity so as not to create a material issue of fact.

forthcoming as required under the contracts. It was Defendants' failure to provide the requested assurances, and not just the email communication, that Plaintiff claims constituted a repudiation of the Contracts.[15]

### 2.    Plaintiff Requested Adequate Assurances.

Plaintiff requested adequate assurances on more than one occasion. The first request was an April 17, 2008 letter written by one of Plaintiff's principals, Tomas Gonzalez, wherein he requested "immediately a written explanation of the situation set forth in this e-mail [the forwarded email messages in the Rivas Email] sent by Bariven executives." (*See* Exhibit 14 – April 17, 2008 Letter). In addition, on May 9, 2008, Plaintiff's counsel sent correspondence to Defendants specifically requesting "adequate assurances," within five business days, as to whether Defendants would honor their obligations under the Contracts. (*See* Exhibit 15 – May 9, 2008 Letter).

While Defendants concede that the May 9, 2008 letter was a request for adequate assurances (*see* D.E. 79 - Hearing Transcript, p. 53), they question whether the April 17, 2008 letter was a request for adequate assurances because it failed to track the language of Section 672.609, Florida Statutes. The Court takes a different view. The April letter was written by a layperson, not by attorneys, and while it does not track the language contained in Section

---

[15] Defendants' reliance on *Ball Banking Corp. v. UPG, Inc.*, 985 F.2d 685 (2d Cir. 1993), is equally misguided. In *Ball*, the buyer prevented a vessel carrying the seller's petroleum from berthing, and ninety minutes later, the buyer issued a demand for adequate assurances. *Id.* at 703. The buyer did not have grounds for insecurity because there was undisputed evidence that the buyer knew another vessel containing the seller's petroleum had unloaded cargo in excess of that contracted for. *Id.* Further, the buyer had an incentive to avoid accepting the cargo because the transaction had become unprofitable to the buyer. *Id.* at 704. Accordingly, the court found that the buyer could not "rely upon its own conduct in not permitting the [vessel] to berth and discharge its cargo as a basis for a claim of its own insecurity," and as a matter of law, no reasonable basis for insecurity existed. *Id.* at 703-04. Here, there is nothing to indicate that Plaintiff in any way interfered with Defendants' performance under Contracts 632 and 757, and it was Defendants' conduct (*i.e.*, the transmittal of the Rivas Email and suspension of payments), not Plaintiff's conduct, that caused Plaintiff's insecurity. Moreover, Plaintiff had no incentive to avoid Contracts 632 and 757. Plaintiff is suing Defendants for over $30,000,000 in lost profits allegedly suffered as a result of Defendants' repudiation of Contracts 632 and 757. (*See* Exhibit 1 – Am. Compl. ¶¶ 50, 60).

672.609, there is no requirement that requests for assurances track the statute. The April letter does request adequate assurances of due performance. The letter explains to Defendants that Plaintiff views the contents of the Rivas Email as "a serious situation" in that it states there is a "payment freeze" and "cancellation of outstanding contracts." (*See* Exhibit 14 – April 17, 2008 Letter). The letter outlines Plaintiff's concerns raised by the Rivas Email, and expressly requests "a written explanation of the situation." (Id.). These communications suffice as requests for adequate assurances.[16]

Indeed, while Defendants responded to Plaintiff's requests for adequate assurances on May 16, 2008 (*see* Exhibit 16), by merely claiming that the Rivas Email was sent in error, and on June 3, 2008 (*see* Exhibit 18), by providing a proposed agreement for Plaintiff to execute, Defendants remained silent as to the accuracy of the cancellation and suspension instructions contained in the Rivas Email, and they failed to inform Plaintiff that the Contracts would be honored on their terms. Defendants' silence on the contents of the Rivas Email could be taken as confirmation of what was stated therein. There is no writing or alleged oral statement where

---

[16] The cases cited by Defendants are again inapposite. In *Beeche Systems Corp. v. D.A. Elia Construction Corp.*, 164 B.R. 12, 17 (N.D.N.Y. 1994), the seller never gave any indication that it would not honor the contract, but nevertheless, sent a letter advising it was concerned that the seller would not honor the contract, and therefore, the buyer threatened to set-off the amount owed to the seller as a pre-payment. "Rather than being a request for adequate assurances, [the] letter constituted a statement of what [buyer] had determined it would do with respect to the balance due under the contract and the exercise of the buy-back provision." *Id.* The facts here are also different from those in *Scott v. Crown*, 765 P.2d 1043, 1046 (Colo. Ct. App. 1988), where the seller "simply told Buyer's driver that he wanted to 'settle' some questions with Buyer." The court noted that the seller demanded performance beyond that required by the contracts, and because the alleged demand was not in writing and "did not communicate clearly" a demand for assurances of performance, the seller's alleged request for assurances was not within the scope of Section 2-609. *Id.* at 1046-47. Likewise, the facts here are different from those in *SPS Industries, Inc. v. Atlantic Steel Co.*, 366 S.E. 410, 414 (Ga. Ct. App. 1988), where genuine issues of material fact remained concerning whether the buyer's letter was a demand for adequate assurances where it appeared that the letter "was nothing more than a request for information." Finally, the facts are completely inapposite to *United States v. Great Plains Gasification Associates*, 819 F.2d 831, 834-35 (8th Cir. 1987), where the buyer issued a demand for assurances for more than what the seller was obligated to provide under a gas purchase agreement after the buyer had already "openly repudiated" the agreement by refusing to pay for gas and initiating lawsuits where it declared that the agreement was null and void.

Bariven or PSI informed Plaintiff that the instructions in the Rivas Email regarding the cancellation of Contract 757 and suspension of payments to Plaintiff were incorrect.

### 3. Plaintiff Was Not in Breach of Contracts 632 and 757 at the Time It Requested Adequate Assurances.

Defendants claim Plaintiff was in breach of Contracts 632 and 757 and consequently not in a position to demand assurances from Defendants. (*See* D.E. 65 – Defendants' Opposition to Plaintiff's Motion, p. 8). Two key points refute Defendants' argument. First, Plaintiff was not late in making deliveries under Contracts 632 and 757. Second, Defendants never placed Plaintiff on notice of any alleged delays in deliveries or breaches of these Contracts.

#### (a) Plaintiff Was Not Late in Making Deliveries.

Plaintiff was not late in making deliveries under Contracts 632 and 757 because any delays were caused by Defendants, not by Plaintiff.[17] While Defendants claim that Contracts 632 and 757 were entered into no later than March 6, 2008 and March 9, 2008, respectively, the required advances under the Contracts were not paid until April 2, 2008 (for Contract 632) and March 28, 2008 (for Contract 757). (*See* Exhibit 21 – PSI Payment Report; Joint Exhibit 13 – Kabboul Dep. 100:13-22). Defendants delayed allocating the necessary funds resulting in a delay in making the advance payments to Plaintiff (as well as other payments owed at the time to other suppliers). (*See* Joint Exhibit 13 – Kabboul Dep. 99:11-101:22; Joint Exhibit 10 – Gravina Dep. 100:14-102:23). Thus, while the purchase orders indicated that Plaintiff's deliveries were

---

[17] The Court also notes that any delay by Plaintiff would not constitute a material breach under Contracts 632 and 757 as time was not considered to be of the essence in the Contracts. *See Fertilizer Corp. of Am. v. P.S. Int'l, Inc.*, 729 F. Supp. 837, 838 (S.D. Fla. 1989) (time is not considered to be of the essence of a contract unless (1) the contract expressly states so; (2) treating time as non-essential would subject one party to serious injury or loss; or (3) notice has been given to the non-performing party requesting performance within a reasonable time); *Atlanta Jet v. Liberty Aircraft Servs., LLC*, 866 So. 2d 148, 150 (Fla. 4th DCA 2004) (because time was not of the essence in a contract for the sale of an aircraft, the buyer did not breach the contract by failing to perform on time); *see also* Fla. Stat. § 672.612(2) (non-performance under an installment contract must "substantially impair" the value of the contract for the non-performance to be considered a breach of the contract).

scheduled to begin on March 30, 2008 (for Contract 757) and April 9, 2008 (for Contract 632), Defendants' delays in paying the advances under the Contracts extended the timing for scheduling those deliveries. (*See* Joint Exhibit 13 – Kabboul Dep. 99:11-19; 100:19-101:17; Joint Exhibit 10 – Gravina Dep. 100:14-102:23; Joint Exhibit 9 – Gonzalez Dep. 105:17-107:10). According to Defendants' president, Mr. Kabboul, contractual relationships with food suppliers were not initiated until corresponding advances were paid. (*See* Joint Exhibit 13 – Kabboul Dep. 95:9-101:22). Defendants acknowledged that their delay in paying the advances would postpone Plaintiff's delivery obligations under Contracts 632 and 757, and Defendants even anticipated these delays by late March 2008. (*See* Joint Exhibit 13 – Kabboul Dep. 95:9-101:22; Joint Exhibit 10 – Gravina Dep. 100:14-102:23). For example, on March 27, 2008, Mr. Kabboul sent an email stating that if the advances were not received by Plaintiff, Defendants could lose the deliveries of food. (*See* Joint Exhibit 13 – Kabboul Dep. 101:9-101:21).    While Defendants were having discussions regarding their delays in paying the advances under Contracts 632 and 757, Mr. Gravina sent an internal email stating: "I'm informing them that this is one of the reasons why we haven't been able to receive the delivery schedules. Until these [advance] payments, or L.C.'s, are received by the suppliers, they will not deliver those schedules." (*See* Joint Exhibit 10 – Gravina Dep. 102:8-12). In addition, on March 28, 2008 (the date Defendants claim the first delivery installment of beef was due), after PSI inquired regarding the timing of deliveries under Contract 757, Plaintiff responded that it would not provide Defendants with a delivery schedule until the corresponding advance was received. (*See* Exhibit 10 – Gonzalez 3rd Decl., Exhibits C, D). In response, PSI did not assert that Plaintiff was late under the contract or demand an immediately delivery. Rather, PSI responded to Plaintiff's email by stating "Thank you!!!!!!!!" (Id.).

Because Plaintiff was under no obligation to provide a delivery schedule or make deliveries until the advance payments were made, Plaintiff cannot be faulted for any delivery delays caused by Defendants' delay in making their required advance payments.[18]

### (b)    Defendants Cannot Claim a Breach.

The undisputed facts also show that Defendants never placed Plaintiff on notice that it was in breach of either Contract 632 or 757 as a consequence of deliveries being late or for any other reason. Applying Florida law, the Eleventh Circuit has held that, under the UCC, a buyer cannot claim a breach where the buyer "failed to timely demand compliance with that contract term [the delivery date] or terminate the Contract and file suit." *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1334-35 (11th Cir. 1998); *see also Porterco, Inc. v. Igloo Prods. Corp.*, 955 F.2d 1164, 1171 (8th Cir. 1992) (provisions in a contract which specify or limit the time of performance, even where time is of the essence of the contract, may be expressly or impliedly waived) (citations omitted). In finding that the buyer waived any right to claim a breach, the Eleventh Circuit in *Barth* specifically held that "[w]hen a delivery date passes without the seller's delivery, the buyer must object within a reasonable time and warn the seller that it is in breach." *Id.*

Because Defendants never provided Plaintiff with notice of any kind, written or oral, that it was in breach of Contract 632 or 757, or that the Contracts would be cancelled due to late

---

[18] Defendants cite to *Cafe Cola, Inc. v. Somojo, Inc.*, Civ.A. No. 96-562, 1996 WL 116224 (E.D. La. Mar. 14, 1996), for the proposition that it is "presumptuous" for a seller to demand adequate assurances from a buyer where the seller failed to timely deliver merchantable goods. *Somojo* does not apply because the record does not support Defendants' claim that Plaintiff failed to timely deliver goods. Moreover, in *Somojo*, there was evidence that the seller was motivated to get out of a contract in order to enter into a potentially more lucrative contract, and thus, the seller demanded assurances of payment from the buyer even though the seller was late in its delivery and "there had not been any evidence of non-payment on demand." *Id.* at *4-5. In response to the seller's demand for assurances, the buyer sent "a letter of confirmation that there was no problem with the finances of [buyer] from the account executive of [buyer's] bank." *Id.* at *5. Thus, the court found the buyer "substantially performed its part of the contract" and ordered the seller to comply with the contract on its terms. *Id.* at *6, 8.

deliveries, Defendants cannot now claim a breach.  In fact, in response to Plaintiff's requests for assurances, Defendants sent Plaintiff correspondence on May 16, 2008 (Exhibit 16) and June 3, 2008 (Exhibit 18).   Neither communication contains a claim Plaintiff was late in making deliveries or in breach of either Contract 632 or 757.  Defendants also accepted the beef that Plaintiff delivered to Venezuela in June 2008 under Contract 757 and did not reject the beef as non-conforming or for late delivery.  Defendants are thus barred from now claiming a breach. *See* Fla. Stat. § 672.607(3)(a) (providing that, upon acceptance, a buyer must give notice of breach or be barred from any remedy); *Nebula Glass Int'l. Inc. v. Reichhold, Inc.*, No. 02-60703-CIV, 2004 WL 4946483, at \*5 (S.D. Fla. Apr. 27, 2004); *Gen. Matters, Inc. v. Paramount Canning Co.,* 382 So. 2d 1262, 1263-64 (Fla. 2d DCA 1980).

Defendants' failure to notify Plaintiff of any alleged breach of the Contracts is magnified by the fact that the parties are merchants, and the good faith obligation for merchants imposed by the UCC requires that a party provide the party that is not in compliance with a contract with reasonable notification of termination before treating the contract as breached. *See KLT Indus., Inc. v. Eaton Corp.*, 505 F. Supp. 1072, 1079 (E.D. Mich. 1981) (the good faith obligation for merchants requires that reasonable notification of termination be received before a contract could be "treated as breached") (citing Comment 5 of UCC 2-309, which has been enacted in § 672.309, Fla. Stat.).

In short, because Defendants never gave Plaintiff any notice of breach, they are now barred from holding Plaintiff accountable for alleged delays in delivery or breach of contract. Moreover, even if Defendants had claimed a breach, Plaintiff was entitled by law to suspend its own performance as of April 17, 2008 while it waited for Defendants to provide it with the

requested adequate assurances. *See* Fla. Stat. § 672.609(1); *see also Clem Perrin Marine Towing Inc.*, 730 F.2d at 191.[19]

### 4.     Defendant Failed to Provide Adequate Assurances.

Section 672.609 of the Florida Statutes allows a party who requests adequate assurances to treat the failure by the other party to provide the requested assurances as a repudiation of the contract, allowing the requesting party to sue for breach. *See* Fla. Stat. § 672.609.  Section 672.609 also requires a response within a reasonable time, not to *exceed* thirty days.  Fla. Stat. §672.609(4) (emphasis added); *see also Hitachi Zosen Clearing, Inc. v. Liberty Mut. Ins. Co.*, No. 92 C 5363, 1996 WL 388432, at *7 (N.D. Ill. July 8, 1996) (finding a period of "less than 30 days" reasonable for repudiation of contract for sale of accessories to water pipes).

Defendants repudiated the Contracts automatically upon passage of the outer limits of the thirty day statutory time period. *See* Fla. Stat. § 672.610 cmt. n.2.  Specifically, by June 10, 2008, more than fifty days had passed since Plaintiff first requested adequate assurances in its April 17, 2008 letter (Exhibit 14), and more than thirty days had passed since Plaintiff had requested assurances in its May 9, 2008 letter (Exhibit 15), and yet, Defendants had still not provided Plaintiff with the requested assurances.  In light of the magnitude of the situation, where Plaintiff was insecure as to the status of the Contracts and whether it would continue to

---

[19] Defendants cite to *Hope's Architectural Products, Inc. v. Lundy's Construction, Inc.*, 781 F. Supp. 711, 712 (D. Kan. 1991), for the proposition that a party in breach is not permitted to invoke UCC Section 2-609 by demanding assurances. (*See* D.E. 50 at 11).  Because Plaintiff was not in breach of Contracts 632 and 757 at the time it requested assurances, *Hope's* does not apply.  In addition, *Hope's* is distinguishable. *Hope's* concerned a dispute on a contract for production and installation of windows, where the buyer complained to the seller that the seller was late in its delivery and threatened to deduct liquidated damages from the contract price or impose a back charge for the buyer's alleged damages. *Id.* at 712-13.  In response, the seller requested assurances and demanded prepayment of the full contract price before delivery. *Id.* at 713.  The court found the seller's demand for assurances was excessive because the buyer "never gave any indication that it was unable or unwilling to pay the amount it owed to [seller] when the windows were delivered and [a public works bond with a bank as surety] stood as security for [buyer's] obligation." *Id.* at 716.  The court noted that "[b]y demanding prepayment, [seller] essentially attempted to rewrite [the payment] term of the contract." *Id.*  Thus, the court found that "[b]oth [seller's] delay in delivering the windows and [seller's] excessive demands entitled [buyer] to treat [seller] as in breach and to cancel the contract." *Id.* at 717.

receive payments from Defendants, Defendants' failure to immediately provide Plaintiff with the requested assurances within a period of less than thirty days constituted a repudiation of the Contracts.  Notably, in its April 17, 2008 request for adequate assurances, Plaintiff requested an "immediate" response, and in its May 9, 2008 request, Plaintiff requested a response within five business days.  (*See* Exhibit 14 – April 17, 2008 Letter; Exhibit 15 – May 9, 2008 Letter). Plaintiff requested an immediate response (of less than thirty days) because its contracts with its suppliers (which obligated Plaintiff to pay over $117 million to supply the goods covered under Contract 632 and 757) were in jeopardy while Plaintiff waited for Defendants to affirm whether they would honor their obligations under the Contracts.  (*See* Exhibit 5 – PATC Contract (D.E. 51-9); Exhibit 6 – Quatro Marcos Contract (D.E. 51-8)).

Rather than providing Plaintiff with the requested explanations and assurances, Defendants instead attempted to modify the terms of the Contracts, first at the April 29, 2008 meeting with Mr. Kabboul and then through the agreement forwarded by Mr. Gravina on June 3, 2008.  (*See* Joint Exhibit 13 – Kabboul Dep. 161:25-162:7; 166:18-25; 167:21-24; 169:13-171:17; Joint Exhibit 9 – Gonzalez Dep. 148:2-149:2; 150:3-11; 151:1-11; 151:19-155:20; Exhibit 18 – June 3, 2008 Email and Proposed Agreement).[20]   Defendants' proposed modifications to the existing terms of the Contracts cannot qualify as adequate assurance. *See, e.g., Fertilizer Corp.*, 729 F. Supp. at 840 (holding that offer to change material terms constitutes an anticipatory repudiation); *Kaiser-Francis Oil Co.*, 870 F.2d at 569 (where the buyer indicated he would only perform if the contract was amended, the buyer failed to provide adequate

---

[20] PSI also sent a letter to Plaintiff on May 16, 2008 stating the Rivas Email was inadvertently forwarded to Plaintiff and was "privileged and confidential," so it should not be taken into consideration. (*See* Exhibit 16 – May 16, 2008 Letter). The letter, however, did not state that the instructions to cancel Contract 757 and suspend payments to Plaintiff were erroneous, and payments were suspended. Mr. Gravina, the PSI employee who signed the May 16 letter, has acknowledged that his letter did not address in any way Plaintiff's request for assurances regarding whether Defendants' would honor the Contracts and their payment obligations. (*See* Joint Exhibit 10 – Gravina Dep. 119:12-120:12).

assurances of performance); *La. Power & Light Co. v. Allegheny Ludlum Indus., Inc.*, 517 F. Supp. 1319, 1323 (E.D. La. 1981) (a qualified promise of performance is not adequate assurance); *Copylease Corp. v. Memorex Corp.*, 403 F. Supp. 625, 631 (S.D.N.Y. 1975) (holding that demand for modification of contract is not adequate assurance); *Land O'Lakes, Inc. v. Hanig*, 610 N.W.2d 518, 524 (Iowa 2000) (a promise of performance conditioned on a requirement not within the terms of the contracts is not adequate assurance).

In fact, such proposed modifications are themselves repudiations of the Contracts. *See* Fla. Stat. § 672.610 cmt. n.2 ("[R]epudiation can result from action which reasonably indicates a rejection of the continuing obligation. . . . a statement of intention not to perform except on conditions which go beyond the contract . . . [is] a repudiation"). Applying UCC § 2.610, courts across the country and within the Southern District of Florida have held that a party's attempt to modify the terms of a contract constitutes a repudiation of the contract in light of a request for adequate assurances. For example, in *Aero Consulting Corp. v. Cessna Aircraft Co.*, the buyer testified that he always intended to pay the full balance due and "never stated unequivocally" that he would not pay the full price if his new conditions were not met. 867 F. Supp. 1480, 1491 (D. Kan. 1994). However, when the buyer met the seller to make payment, the buyer brought a check for a lesser amount, requested new conditions such as placing money in escrow, and left without making any further arrangements for payment. *Id.* at 1486, 1491-92. The court held that the buyer's conduct was an anticipatory repudiation as a matter of law because it reasonably indicated an intent not to perform unless the seller agreed to the new conditions. *Id.* at 1491-92.

Defendants attempted to change the terms of the Contracts on various occasions. First, at an April 29, 2008 meeting, Mr. Kabboul informed Plaintiff that Defendants would not remit additional payments to Plaintiff until all outstanding deliveries were made. (*See* <u>Joint Exhibit 13</u>

– Kabboul Dep. 167:21-24; 169:13-171:17). This runs contrary to the plain terms of the Contracts, which require immediate payment within seven days. (*See* <u>Joint Exhibit 10</u> – Gravina Dep. 78:14-17; <u>Joint Exhibit 1</u> – Alvarez Dep. 7:7-13; 12:6-17). Also at this meeting, Mr. Kabboul demanded a modification of Contracts 632 and 757, which Plaintiff did not accept, requiring Plaintiff to deliver all of the product covered under the Contracts up to the amount of the corresponding advances, and then migrating to letters of credit thereafter for payment. (*See* <u>Joint Exhibit 13</u> – Kabboul Dep. 176:23-25; <u>Joint Exhibit 9</u> – Gonzalez Dep. 129:3-19).

Second, on June 3, 2008, PSI sent Plaintiff a proposed agreement drafted by Bariven. (*See* <u>Exhibit 18</u> – June 3, 2008 Email and Proposed Agreement). This proposed agreement materially sought to alter the Contracts by: (1) reducing the amount owed to Plaintiff by over $3 million; (2) requiring posting of letters of credit to secure payment for partial deliveries; (3) changing the delivery schedules under the Contracts; (4) releasing both Bariven and PSI from all liability for their actions; (5) making PSI the only responsible party going forward; and (6) forcing Plaintiff to sue only in Texas if it had further grievances. (<u>Id</u>.). These proposed modifications were not assurances that Defendants would honor the Contracts, rather they were statements of Defendants' intentions not to perform under the Contracts except on new conditions.

In sum, because there are no written communications where Defendants provided Plaintiff with the requested assurances that they would pay for deliveries made or honor the Contracts on their terms, Defendants repudiated the Contracts. Defendants breached Contracts 632 and 757, and thus Plaintiff's Motion as to Counts IV and V is GRANTED.

      **C.**    **Defendant PSI Is Liable Under the Contracts.**

            **1.**    **PSI Manifested an Intent to Be Bound by the Contracts.**

PSI claims it is entitled to dismissal of this action because it acted as an agent for a disclosed principal, Bariven, and did not express or imply an intent to itself be bound by the Contracts. (*See* D.E. 47 – PSI's Motion, p. 5-6). PSI points to the purchase orders and other documents that label PSI as the "Purchasing Agent" of Bariven or indicate that Bariven was acting care of ("c/o") PSI. (Id. at 6-7). In support of its contention that it cannot be liable under the Contracts, PSI quotes the Restatement (Third) of Agency, § 6.01, comment (d), which states: "[i]f a contract names both the principal and the agent, *in the absence of a manifestation to the contrary* the agent is not a party to the contract if the contract indicates that the agent is named only as agent." (Id. at 7) (emphasis added). The Court agrees with this conclusion of law; however, the analysis does not end there.

Although there is no question that the purchase orders and other documents identify PSI as Bariven's purchasing agent, and Plaintiff concedes this point, Plaintiff argues that PSI demonstrated a "manifestation to the contrary" and indicated it was a party the Contracts. The Court agrees. A label does not serve to exonerate a purported agent where there is an intent to be bound by the contracts. *See Lake City Stevedores, Inc. v. East West Shipping Agencies, Inc.*, 474 F.2d 1060, 1063 (5th Cir. 1973); *El Jordan v. Solymar, S. De R.L.*, 315 F. Supp. 2d 1355, 1364 (S.D. Fla. 2004). Citing to U.S. Supreme Court precedent and the Restatement of Agency, the *Lake City* court held that an "[a]gent for a disclosed principal may bind himself if he conducts himself in such a way as to indicate an intent to be bound." *Lake City*, 474 F.2d at 1063.

Florida law is in line with this principle, and undoubtedly recognizes that an agent of a disclosed principal can be held liable for the acts of the principal where specific circumstances and objective facts indicate the agent intended to be bound. The court in *Blount v. Tomlinson*, held that an authorized agent acting for a disclosed principal can be held personally liable to the

other contracting party if "he agreed to be so." 48 So. 751, 753 (1909). Similarly, in *First Automotive Service Corp. v. First Colonial Ins. Co.*, the court held that, under Florida law, an agent for a disclosed principal may be liable if there are "circumstances showing that personal liability was intended to be incurred." No. 3:07-cv-682-J-32TEM, 2008 WL 816973, *5 (M.D. Fla. March 25, 2008).

Plaintiff cites to several cases from the Seventh Circuit that, while not binding, provide some guidance as to how to determine if an agent for a disclosed principal is acting as more than an agent, and expressing liability under a contract. For example, Plaintiff cites to *Dyna-Tel, Inc. v. Lakewood Engineering*, 946 F. 2d 539, 542 (7th Cir. 1991), where the court found that a mere "care of" designation was not controlling to its determination, but that the scope of agent's relationship to, or obligation under, an agreement "must be inferred from a series of meetings, documents and acts." There, the court considered several factors, such as the fact that the agent directly negotiated prices and was the payee under a letter of credit, in determining whether the agent was a "seller" for the purpose of being bound by the subject agreement. *Id.* Similarly, in *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 652 F. 2d 340 (7th Cir. 1981), the court found a parent company liable under a contract of its subsidiary because of the parent company's position on the abortive attempts to settle the transaction. *Id.* at 342.

Here, the undisputed facts show that in the framework of its relationship with Plaintiff, PSI acted as a contracting party, and its conduct demonstrates it intended to be bound by the Contracts. Mr. Gravina, PSI's International Purchasing Supervisor, acknowledged that PSI believed it would be liable to Plaintiff for cancellation fees for cancelling contracts for the purchase of pasta and pork in late 2007. (*See* Joint Exhibit 10 -- Gravina Dep. 66:5-14). In addition, Mr. Gravina and Ruben Rios, the other International Purchasing Supervisor with PSI,

believed PSI was liable to Plaintiff for payment on the goods that had been accepted by Defendants and not paid for, and believed PSI faced exposure for the cancellation of Contract 757. (*See* Joint Exhibit 10 – Gravina Dep. 120:18-121:6; Exhibit 11 – Rios Aff. ¶¶ 34, 40, 41). This is understandable, as it was PSI, and not Bariven, that acted at all material times as the party responsible to Plaintiff for the obligations arising under the Contracts. It was PSI, not Bariven, that invited Plaintiff to submit quotations, and it was PSI that negotiated with Plaintiff over the amounts of the advance payments under the Contracts and over the terms of the performance bonds that Plaintiff caused to be issued in favor of Plaintiff. (*See* Joint Exhibit 13 – Kabboul Dep. 99:4-19; Joint Exhibit 1 – Alvarez Dep. 27:5-28:17; 30:17-31:18; 33:7-14). The performance bonds named PSI, not Bariven, as the sole beneficiary. (*See* Exhibit 9 – Letters of Guarantee (D.E. 73-9)). PSI, not Bariven had the direct relationship with Plaintiff. (*See* Joint Exhibit 13 – Kabboul Dep. 63:5-13). This is further evidenced by a January 15, 2008 letter that PSI issued for presentation to third parties, acknowledging its business relationship with Plaintiff and stating:

> This letter is to confirm that PDVSA Services Inc. . . . has been doing business with Dexton SA since 2007, with purchases on the filed [sic] for over 50 MM $/year, contributing with the Food Emergency in Venezuela . . . . The company has demonstrated the necessary skills to provide with prompt deliveries to the [Venezuelan] ports, Puerto Cabello and La Guaira, of the different commodities, Beef, Whole chicken, Pork, Black beans and Pasta.

(*See* Exhibit 12 – Gonzalez Decl., Exhibit 7-d). The letter notably makes no reference to Bariven.[21]

---

[21] There are additional facts that show PSI acted as the contracting party. For example, Mr. Kabboul (the President of both Bariven and PSI) admitted that PSI, not Bariven, handled the operational details with regard to the Contracts. (*See* Joint Exhibit 13 – Kabboul 50:13-21). He further testified that PSI had the relationship with Plaintiff, and that to him Dexton was "simply a name on a piece of paper." (Id. at 50:13-51:6; 56:1-20; 62:4-63:17; 131:18-20; 234-3-8). Finally, Mr. Kabboul also admitted he was unaware of meetings and negotiations that occurred between PSI and its suppliers, nor was he aware of the sourcing of goods, because PSI runs its business itself. (Id ).

PSI also expressed an intent to be bound by the Contracts. Florida law provides that an agent entering into a contract on behalf of a disclosed principal becomes a party to the contract upon an express agreement to do so. The proposed agreement Defendants presented to Plaintiff on June 3, 2008 (*see* Exhibit 18), after Plaintiff requested adequate assurances from Defendants, supports this finding. PSI, through Mr. Gravina, presented the proposed agreement that, among other things, conditioned payment for the Contracts on the removal of Bariven as an obligated party under the agreements. (Id.). As such, the proposed agreement left PSI as the only responsible party under the Contracts. Moreover, the specific terms of the proposed agreement, which was drafted by Bariven's attorneys, did not mention Bariven because Bariven understood the contracting parties under the proposed agreement were only going to be PSI and Plaintiff. (Id.) Additionally, the proposed agreement confirmed "***PSI*** owes an existing debt of $3,721,125.11." (Id.) (emphasis added). Accordingly, PSI, Plaintiff, and Bariven expected PSI to be the sole party liable to Plaintiff for the Contracts.

This proposed agreement even acknowledges that "PDVSA SERVICES has placed purchase orders numbered 5100058368, 5100058326, 5100061757, 5100058495 and 5100061632, with DEXTON [VALIDSA], on account of which it has paid the amount of . . . US$ 68.350.880,00 . . . [and] *PDVSA Services, Inc. shall pay its outstanding debt*. . . ." (Id.). (emphasis added). Thus, the proposed agreement represents an express manifestation by PSI and Bariven of PSI's intent to be liable for the Contracts. Such express manifestation of intent makes PSI liable under the Contracts. *See Bertram v. Sterling Bank & Trust*, 820 So. 2d 963, 965 (Fla. 4th DCA 2002); *see also Kanov v. Bitz*, 660 So. 2d 1165, 1165-66 (Fla. 3d DCA 1995); *Phillip Schwartz, Inc. v. Gold Coast Graphics, Inc.*, 623 So. 2d 819, 820 (Fla. 4th DCA 1993).

The undisputed facts demonstrate that PSI conducted itself such that it expressly and impliedly indicated an intent to be liable under the Contracts.  Under these circumstances, Florida law permits Plaintiff to bring a cause of action for breach against PSI.  Accordingly, PSI's Motion is DENIED with prejudice.

### D. Bariven's Counterclaims for Breach of Contract and Breach of the Implied Covenant of Good Faith, Fair Dealing and Commercial Reasonableness Fail Because Bariven Breached Contracts 632 and 757.

The Court has already found that Bariven breached Contracts 632 and 757 by repudiating the Contracts.  Bariven cannot maintain breach of contract claims against Plaintiff for the very Contracts Bariven repudiated.[22]  In addition, because Bariven's breach of contract claims fail, Bariven's claim for breach of the implied covenant of good faith, fair dealing and commercial reasonableness must also fail.  *See Centurion Air Cargo, Inc. v. United Parcel Service Co.*, 420 F.3d 1146, 1152 (11th Cir. 2005) ("a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract") (citations omitted); *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1438 (S.D. Fla. 1996) (application of covenant of good faith is not available "where there is no accompanying action for breach of an express term of the agreement").  Because Bariven cannot maintain an express breach of contract claim under Contracts 632 and 757, Bariven also cannot maintain a claim for breach of the implied covenant of good faith and fair dealing under the same Contracts.  *See Centurion*, 420 F.3d at 1152 (finding where a party is found not to have breached the express terms of a purchase agreement, Florida law precludes a finding of the

---

[22] Bariven claims in Counts I and II of its Counterclaim that Plaintiff breached Contracts 632 and 757 by initiating this action and alleging that Defendants repudiated Contracts 632 and 757, rather than performing under the Contracts. (*See* Answer, ¶¶ 119, 124). If the Court finds in Plaintiff's favor, that Bariven repudiated Contracts 632 and 757, Bariven's breach of contract claims must fail. Indeed, Defendants conceded as much at oral argument: "But in order to find liability in one direction or the other, the Court has to resolve the anticipatory repudiation issue." (*See* D.E. 79 – Hearing Transcript, p. 38).

implied covenant of good faith and fair dealing); *Barnes*, 932 F. Supp. at 1438-39.

Accordingly, Bariven's breach of contract claims under Contracts 632 and 757 (Counts I and II, respectively) and breach of the implied covenant of good faith and fair dealing claims (Counts V and VI, respectively) are DISMISSED with prejudice.

### E.   Bariven's Counterclaims for Unjust Enrichment Under Contracts 632 and 757 Fail.

Bariven's claims for unjust enrichment under Contracts 632 and 757 (Counts III and IV, respectively) fail for the simple reason that, under Florida law, an unjust enrichment count must fail upon the showing of an express contract. *See Mobil Oil Corp. v. Dade County Esoil Mgmt. Co.*, 982 F. Supp. 873, 880 (S.D. Fla. 1997). Here, there is no dispute that Contracts 632 and 757 exist and are "valid and enforceable" contracts. (*See* Answer, ¶¶ 118, 123). Nevertheless, Bariven attempts to bring unjust enrichment claims under the very same Contracts. (*Id.* at ¶¶ 127–38). Bariven claims it can do so because its unjust enrichment claims are pleaded in the alternative to its breach of contract claims. The facts and the law show otherwise.

The parties have admitted to the existence of express contracts, specifically, to the existence of Contracts 632 and 757, from which Bariven's unjust enrichment claims arise.[23] This fact deals a fatal blow to Bariven's unjust enrichment claims. While a party can plead breach of contract and unjust enrichment in the alternative, a party is nonetheless precluded from pleading unjust enrichment where, as here, the existence of an express contract is not in doubt. In *Shibata, M.D. v. Lim*, 133 F. Supp. 2d 1311, 1316 (M.D. Fla. 2000), a case relied on by Bariven, the court stated that "Florida law does not generally permit a party to pursue a cause of action on

---

[23] Bariven's unjust enrichment claims arise directly from Contracts 632 and 757. Bariven's unjust enrichment claims are titled "Unjust Enrichment/Contract 632" (Count III) and "Unjust Enrichment/Contract 757" (Count IV). Bariven also represented to the Court that its unjust enrichment counts "aris[e] out of two of the five purchase orders [Contracts 632 and 757] for perishable food commodities entered into between the parties." (*See* D.E. 56 – Bariven's Opposition to Plaintiff's Motion to Dismiss, p. 1).

an express contract at the same time as he pursues a cause of action for unjust enrichment." The court further stated that "[p]roof of an express contract defeats a claim for unjust enrichment." *Id.* Here, proof of two express contracts defeats Bariven's claims for unjust enrichment.[24] The facts in this case are analogous to the facts in *Webster v. Royal Caribbean Cruises, Ltd.*, 125 F. Supp. 2d 1317 (S.D. Fla. 2000), and *Taylor, Bean & Whitaker Mortgage Corp. v. GMAC Mortgage Corp.*, No. 5:05-cv-260-Oc-10GRJ, 2006 WL 4990903 (M.D. Fla. June 15, 2006). In *Webster*, the court granted defendant's motion to dismiss the plaintiff's unjust enrichment claim (which the plaintiff attempted to plead in the alternative to a breach of contract claim) because the defendant admitted to the existence of an express contract between the parties and even submitted a copy of the contract to the court. 124 F. Supp. 2d at 1326. Likewise, here, Plaintiff has also admitted to the existence of Contracts 632 and 757, and thus, Bariven's unjust enrichment claims arising from those Contracts fail. Similarly, in *Taylor, Bean*, the court also granted the defendant's motion to dismiss the plaintiff's claim for unjust enrichment because the plaintiff failed to allege the contract was invalid or unenforceable, but rather, sued for breach of contact and unjust enrichment for funds received under the contract. 2006 WL 499090, at \*7. None of the parties here has asserted Contracts 632 and 757 are invalid or unenforceable. To the contrary, Bariven and Plaintiff have both admitted Contracts 632 and 757 are existing, valid and enforceable contracts.

---

[24] This is not a situation like *Thunderwave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562 (S.D. Fla. 1997), a case upon which Bariven relies. There, plaintiff was allowed to proceed with counts for breach and unjust enrichment in the event that the plaintiff failed to prove the existence of an express contract. *Id.* at 1566. Here, there is no legal justification for Bariven to proceed with its unjust enrichment claims. Nor is this a situation like the one in *Rolyn Construction Corp. v. Coconut Grove PT Ltd. Partnership*, No. 07-20834-CIV, 2007 WL 2071268 (S.D. Fla. July 19, 2007), also relied upon by Bariven, where the court allowed plaintiff to plead unjust enrichment in the alternative to breach of an oral contract. There, the court allowed the unjust enrichment claim to proceed because the plaintiff excluded any allegation that it had an oral contract with the defendant in its unjust enrichment claim by only incorporating specific paragraphs of its complaint within the unjust enrichment claim. *Id.* at \*2. Bariven did not do that here.

Accordingly, because Bariven has admitted that Contracts 632 and 757 are valid and existing contracts, and Bariven has already asserted claims for breach of Contracts 632 and 757 (Counts I and II, respectively), and claims for breach of the implied covenant of fair dealing in connection with the same Contracts (Counts V and VI, respectively), Counts III and IV for unjust enrichment under Contracts 632 and 757 are DISMISSED with prejudice.

### F.     Bariven's Equitable Accounting Claim Fails.

Under Florida law, a party seeking an equitable accounting, as Bariven does in Count VII, must show the existence of a fiduciary relationship or complex transaction and must demonstrate it has no adequate remedy at law. *Fla. Software Sys., Inc. v. Columbia/HCA Healthcare Corp.*, 46 F. Supp. 2d 1276, 1285 (M.D. Fla. 1999) (citing *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1540 (11th Cir. 1990)); *see also Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1293 (S.D. Fla. 2007) (citing Florida state court cases).

Here, there is no fiduciary duty between Bariven and Plaintiff, and Bariven has not shown one exists.   The only relationship between Plaintiff and Bariven is a contractual relationship between merchants.   Bariven nevertheless claims it can maintain its equitable accounting claims because Contracts 632 and 757 are complex transactions.   This position fails to persuade.

Contracts 632 and 757 are not complex transactions; they are merely installment contracts for the sale of sugar and beef, respectively.   There is nothing complex about the Contracts from an operational or financial standpoint.   Indeed, the only transactions under the Contracts for which Bariven seeks an accounting are the payment of the advances Defendants made under Contracts 632 and 757.   The amount of the advances, however, is not in dispute. (*See* D.E. 39, ¶¶ 97, 104).   Notwithstanding, Bariven asks the Court to find the transactions are

complex when the only allegation in its Counterclaim regarding the supposed complexity of the transactions is the allegation that "Contracts 632 and 757 are complex transactions." (*See* Exhibit 2 – Answer ¶ 155). Such a conclusory allegation cannot sustain a claim for accounting. *See Staup v. Wachovia Bank, N.A.*, No. 08-60359-CIV, 2008 WL 2598005 *4 (S.D. Fla. June 27, 2008) (dismissing equitable accounting claim where the plaintiff's "conclusory allegations" did not show any of the necessary elements to maintain an accounting claim).

Bariven's reliance on *Chiron v. Isram Wholesale Tours and Travel, Ltd.*, 519 So. 2d 1102, 1103 (Fla. 3d DCA 1988), is unavailing. In *Chiron*, the Third District Court of Appeal affirmed an order dismissing an equitable accounting claim at the motion to dismiss stage. *Id.* at 1103. The court found that even though the plaintiff alleged the transactions were complex and there existed no adequate remedy at law, "the evidentiary facts alleged by [the plaintiff] show neither complexity nor inadequacy of a legal remedy." *Id.* Similarly, Bariven's allegations fail to show that Contracts 632 and 757 are complex or that Bariven has no adequate remedy at law.[25] Dismissal of Bariven's equitable accounting claim is therefore appropriate. *Id.*; *see also Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1071 (11th Cir. 2007) (affirming the dismissal of equitable accounting claims, under Florida law, where the plaintiff did not establish the existence of a fiduciary relationship or complex transaction).In addition, Bariven's argument that Florida law permits an equitable accounting if it is necessary to determine the extent of the claimed damages for breach of a contract fails to persuade. In its breach of contract claims (Counts I and II), Bariven sought recovery of the advance payments it made to Plaintiff. The parties agree that Defendants made advance payments to Plaintiff under Contracts 632 and 757, and the amount of the advances is not in dispute. Moreover, the advances are secured by guarantee bonds issued in PSI's favor. Thus, Bariven fails to show why it would need an accounting to determine what its advances were, and even if it

---

[25] *Bates v. Northwestern Human Services, Inc.*, 466 F. Supp. 2d 69 (D.D.C. 2006), relied on by Bariven, is inapposite. This action is governed by Florida law whereas *Bates* is an action from the District of Columbia that analyzes equitable accounting cases from outside of Florida and outside the Eleventh Circuit. Moreover, *Bates* involved a transaction with "complicated" payments. *Id.* at 104. Here, Bariven made two advance payments to Plaintiff. The amount of the advances (30% of the value of Contracts 632 and 757) is not in dispute, and there is nothing complicated regarding the payment of the advances.

succeeded on its breach of contract claims, Bariven would have been able to recover the advances if and when PSI collected on the performance bonds.

Finally, Bariven's equitable accounting claim fails because there exists an adequate remedy at law. *Kee*, 918 F.2d 1538 at 1541 ("When a judgment for breach of contract is obtainable, the remedy at law is considered adequate, precluding the need for the imposition of an equitable remedy.") (citing *Mary Dee's, Inc. v. Tartamella*, 492 So. 2d 815, 816 (Fla. 4th DCA 1986)). For the foregoing reasons, Bariven's equitable accounting claim (Count VII) is DISMISSED with prejudice.

### G.   Nature of Holding.

The undersigned has not been asked to determine the dollar amount of the damages involved in this case. This Order merely holds that Plaintiff is entitled to payment of damages Plaintiff can prove at trial resulting from Defendants' breach of the Contracts.

## IV. CONCLUSION

In accordance with the foregoing, it is

**ORDERED AND ADJUDGED** that:

1.   Plaintiff's Motion for Partial Summary Judgment as to Liability Against Defendants (**D.E. 53**) is **GRANTED**. In addition, Plaintiff's Motion which seeks summary judgment dismissal of Bariven's Counterclaims is **GRANTED** and Bariven's Counterclaims are **DISMISSED** with prejudice.

2.   Defendant PSI's Motion for Summary Judgment (**D.E. 47**) is **DENIED**.

3.   Defendant Bariven's Motion for Partial Summary Judgment as to Counts I and II of its Counterclaim and Counts IV and V of Plaintiff's Amended Complaint (**D.E. 50**) is **DENIED**.

4.   A trial on damages owed to Plaintiff will be scheduled by separate Order.

DONE AND ORDERED in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 10th day of July, 2009.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

Copies provided to:

**_Counsel for Plaintiff Validsa, Inc._**
George Mencio, Esq.
Adolfo E. Jiménez, Esq.
Brian A. Briz, Esq.
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, Florida 33131

**_Counsel for Defendants PDVSA Services, Inc. amd Bariven S.A.:_**
 Mark V. Silverio, Esq.
Brian M. Silverio, Esq.
SILVERIO & HALL, P.A.
Museum Tower
150 West Flagler Street, Penthouse
Miami, FL 33130

Anthony D. Mirenda, Esq.
Neil Austin, Esq.
Thomas J. Bone, Esq.
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2600

Ronald E.M. Goodman, Esq.
Janis H. Brennan, Esq.
FOLEY HOAG LLP
1875 K Street NW
Washington, D.C. 20006-1238