IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-21682-CV-KING-BANDSTRA



VALIDSA, INC. d/b/a DEXTON VALIDSA
and DEXTON, S.A., a Florida corporation,

      Plaintiff,

vs.

PDVSA SERVICES INC., a Delaware
Corporation; and BARIVEN S.A., an agency or
instrumentality of a foreign state,

      Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE came before the Court for non-jury trial on damages beginning on January

11, 2010. Previously, on July 10, 2009, the Court entered an Order on Cross Motions for

Summary Judgment (the "Order") (D.E. 85), wherein it granted Plaintiff, Validsa Inc.'s

("Validsa's") Motion for Partial Summary Judgment as to Liability Against Defendants Bariven

S.A. ("Bariven") and PDVSA Services, Inc. ("PSI") (collectively "Defendants"), and dismissed

with prejudice Bariven's counterclaims. The findings of fact and conclusions of law made by the

Court in connection with its ruling on the parties' cross-motions for summary judgment are

binding on the trial of damages in these proceedings. *See Toole v. Baxter Healthcare Corp.*, 235

F.3d 1307, 1313 (11th Cir. 2000) (under the law-of-the-case doctrine, the resolution of an issue

decided at one stage of a case is binding at later stages of the same case).

The undersigned has reviewed the evidence admitted, considered the credibility of the

witnesses, the applicable law, and the arguments presented by counsel. After careful review of

the parties' written and oral submissions, the following findings of fact and conclusions of law are made pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure.

## I.   FINDINGS OF FACT

### A.   Facts Established as Undisputed at Summary Judgment

#### 1.   The Parties

Validsa is a Florida corporation that operates as an international food commodities trader, buying and selling food commodities such as beef, chicken, pork and black beans. *See* Order (D.E. 85) at 2. Defendant Bariven is an agency and instrumentality of the Bolivarian Republic of Venezuela and is a wholly-owned subsidiary of Petróleos de Venezuela, S.A., the Venezuelan national oil company. *Id.* Defendant PSI, a wholly-owned (100%) subsidiary of Bariven, is a Delaware corporation, headquartered in Houston, Texas. *Id.*

#### 2.   The Contracts

There are five contracts at issue between the parties (the "Contracts"). The contracts are: i) Contract 326 (for 5,000 metric tons of bovine beef at a unit price of $4,928.58 per metric ton); ii) Contract 368 (for 480 metric tons of whole chicken at a unit price of $2,257.15 per metric ton); iii) Contract 405 (for 300 metric tons of ground beef at a unit price of $4,999.75 per metric ton); iv) Contract 632 (for 100,000 metric tons of refined sugar at a unit price of $446.92 per metric ton); and v) Contract 757 (for 24,000 metric tons of bovine beef at a unit price of $4,329.58 per metric ton). *Id.* at 3-4.

The Court previously found that Defendants breached Contracts 326, 368, 405 and 757 by failing to pay for goods delivered and accepted. *Id.* at 13-15. The Court also found that Defendants repudiated Contracts 632 and 757 by failing to provide adequate assurances of due performance after having earlier, on April 15, 2008, sent Validsa an email containing instructions

from their President, Georges Kabboul, ordering the cancellation of Contract 757 and the suspension of any payments due Validsa. *Id.* at 28-29. Specifically, Contracts 632 and 757 were first repudiated on April 29, 2008 when Defendants failed to provide Validsa with the requested adequate assurances, but instead attempted to condition the reinstatement of the Contracts on new terms. *Id.* at 29-30.

### 3. Advances

Under the terms of Contract 757 and 632, Defendants were required to remit advance payments to Validsa of thirty percent (30%) of the total price of each purchase order. Trial Exs. 11.23 (Contract 757) & 12.52 (Contract 632). Accordingly, Bariven paid Validsa $31,172,976 on March 28, 2008 as an advance on Contract 757, and Validsa has not returned any portion of that amount to Defendants. Jan. 11, 2010 Trial Tr. 81:15-17. Moreover, Bariven paid Validsa $13,407,600 on April 2, 2008 as an advance on Contract 632, and Validsa has not returned any portion of that to Defendants. *Id.*

### 4. Validsa's Supply Contracts

To meet its obligations under Contracts 632 and 757, Validsa entered into supply contracts with Quatro Marcos Ltda. ("QM") and Pacific Atlantic Trading Company ("PATC"). D.E. #85 at 4. Specifically, to supply Defendants with 24,000 metric tons of bovine beef under Contract 757, Validsa entered into a contract with QM to purchase 24,000 metric tons of bovine beef at a cost of $87,600,000 (the "QM Contract"). *Id.* Likewise, to supply Defendants with 100,000 metric tons of refined sugar under Contract 632, Validsa entered into a contract with PATC to purchase 100,000 metric tons of refined sugar at a cost of $29,500,000 (the "PATC Contract"). *Id.*

3

**B.      Facts Stipulated by the Parties**

The total amount of $7,069,660.69 is due and outstanding for food commodities

delivered by Validsa and accepted by Defendants under Contracts 326, 368, 405 and 757.

Specifically, i) the amount of $1,551,331.00 remains due and outstanding from Defendants for

beef delivered by Validsa and accepted by Defendants under Contract 326; ii) the amount of

$4,157,020.56 remains due and outstanding from Defendants for chicken delivered by Validsa

and accepted by Defendants under Contract 368; iii) the amount of $62,487.95 remains due and

outstanding from Defendants for beef delivered by Validsa and accepted by Defendants under

Contract 405; and iv) the amount of $1,298,821.18 remains due and outstanding from

Defendants for beef delivered by Validsa and accepted by Defendants under Contract 757. *See*

Am. Pretrial Stip. (D.E. 103), ¶¶ 5.b.-e.

**C.      Facts Established at Trial on Damages**

**1.      Sugar Supply Contract with PATC**

The Court has previously found and the parties have stipulated that to supply Defendants

with 100,000 metric tons of refined sugar under Contract 632, Validsa entered into the PATC

Contract (Joint Exhibit 15) with PATC.  The PATC Contract, dated March 14, 2008, obligated

Validsa to pay PATC $29,500,000 for 100,000 metric tons of refined sugar to be delivered to

Defendants in installments.  Tomas Gonzalez ("Mr. Gonzalez"), the General Manager and 51%

owner of Validsa, testified that as of April 15, 2008 (the day Validsa received the email from

Defendant PSI containing instructions from Defendant Bariven to cancel Contract 757 and

suspend any payments to Validsa), Validsa's relationship with PATC was "a normal relationship

between two enterprises." Jan. 11, 2010 Trial Tr. 32:17 – 32:21.  He further testified that

"[t]here was no change" in the relationship two days later, when Validsa sent its demand for

adequate assurances to Defendants. *Id.* at 32:22-24.  Mr. Gonzalez explained that it was on that

4

day, April 17, 2008, that Validsa began to weigh the option of "paralyzing" its performance, and Validsa indeed suspended its performance on April 21, 2008, when he sent an email to Juan Jose Bastardo, an employee of Defendant PSI, advising PSI of the suspension. *Id.* at 32:25 – 33:4; 33:8-10; 34:2 – 35:4. Mr. Gonzalez also testified that as of April 29, 2008, the date the Court found Defendants first repudiated Contracts 632 and 757, Validsa's relationship with PATC remained "normal." *Id.* at 35:5-10.

In May 2008, after Validsa failed to receive the requested adequate assurances from Defendants, Mr. Gonzalez explained that Validsa began to look for ways to avoid its contractual obligations with its suppliers, PATC and QM, which, combined, exposed Validsa to a total obligation of $117 million *Id.* at 35:14-18. Specifically, Mr. Gonzalez testified that Validsa wanted to cancel the PATC Contract. *Id.* at 121:11 – 122:11. He explained that Validsa had already committed $9,500,000 with PATC under the PATC Contract, and Validsa wanted to recuperate this money. *Id.* at 35:19-21. Mr. Gonzalez made clear, however, that as far as Validsa was able to determine, PATC "was capable of supplying the quantity of sugar . . . [and] had over 9.5 million dollars of Validsa to assure that" under the PATC Contract. He testified that but for Defendants' repudiation of Contract 632, PATC would have fulfilled its obligations under the PATC Contract. *Id.* at 122:15 – 123:24.

On June 5, 2008, Validsa entered into a settlement agreement with PATC (Plaintiff's Exhibit 46) wherein it agreed to pay $221,250 to PATC in return for PATC reducing Validsa's obligation from 100,000 metric tons of refined sugar to 25,000 metric tons.[1] *Id.* at 35:22 – 39:8. After Validsa and PATC entered into the settlement agreement, Mr Gonzalez explained that Validsa's relationship with PATC was damaged and a second dispute arose over the remaining

---

[1] 25,000 metric tons of sugar were already loaded at port for delivery, and thus Validsa could not obtain a release of its full obligation for 100,000 metric tons. *Id.* at 36:1-13.

5

25,000 metric tons under the PATC Contract. *Id.* at 36:1 – 38:3. Subsequently, after litigation ensued, on January 29, 2009, Validsa entered into a second settlement agreement with PATC (Plaintiff's Exhibit 48), wherein Validsa agreed to pay $250,000 to PATC and $12,500 to the escrow agent holding $7,000,000 in return for obtaining a release from its obligation to purchase the remaining 25,000 metric tons of sugar. *Id.* at 40:23 – 41:2. Validsa also received the return of approximately $7,000,000 by entering into the agreement. *Id.*

## 2. Beef Supply Contract with QM

The parties have stipulated and the Court has also found that to supply Defendants with 24,000 metric tons of bovine beef under Contract 757, Validsa entered into a contract (Joint Exhibit 19) with QM ("the QM Contract"). The QM Contract, dated March 13, 2008, obligated Validsa to pay QM $87,600,000 for 24,000 metric tons of bovine beef to be delivered to Defendants in installments. Mr. Gonzalez testified that as of April 15, 2008 (the day Validsa received the email from Defendant PSI containing instructions from Defendant Bariven to cancel Contract 757 and suspend any payments to Validsa), the QM Contract was in "good standing." Jan. 11, 2010 Trial Tr. 45:21 – 45:23. After April 17, 2008 (the day Validsa sent Defendants its first demand for adequate assurances), Mr. Gonzalez instructed QM to "stop production" under the QM Contract as there was a "problem" with Defendants. *Id.* at 47:21-25. Mr. Gonzalez also testified that two months after the stoppage, in June 2008, QM threatened to cancel the QM Contract both verbally and by way of a letter dated June 17, 2008 (Plaintiff's Exhibit 45). *Id.* at 50:7 – 51:6. QM began to apply "great pressure" on Validsa. To prevent losing QM as a supplier of the QM Contract, Validsa made a $2,000,000 payment to QM to resolve this dispute. *Id.* at 134:11 – 135:14.

6

## II.    CONCLUSIONS OF LAW

The parties are in agreement that there are three Florida Uniform Commercial Code statutes that govern Validsa's right to damages: Fla. Stat. § 672.709(1)(a) for goods delivered and accepted; Fla. Stat. § 672.708(2) for anticipatory repudiation; and Fla. Stat. § 672.210 for incidental damages. *See* Am. Pretrial Stip. (D.E. 103), ¶¶ 7.a.-c.

### A.    Fla. Stat. §  672.709(1)(a): Damages for Goods Delivered and Accepted

Section 672.709(1)(a) provides, "[w]hen the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price of goods accepted. . . ." Here, the parties stipulated to "the price of goods accepted" under Contracts 326, 368, 405 and 757. Specifically, Defendants failed to pay Validsa $1,551,331.00 for beef delivered and accepted under Contract 326; $4,157,020.56 for chicken delivered and accepted under Contract 368; $62,487.95 for ground beef delivered and accepted under Contract 405; and $1,298,821.18 for beef delivered and accepted under Contract 757. Thus, the total amount due and outstanding for goods delivered and accepted under the Contracts is $7,069,660.69.

Accordingly, Defendants are liable in the amount of $7,069,660.69 under Section 672.709 for goods delivered and accepted.

### B.    Fla. Stat. § 672.708(2): Damages for Anticipatory Repudiation

The Court found, in its Order on Summary Judgment, that Defendants repudiated Contracts 632 and 757. The parties have stipulated that the operative statute for these two contracts is therefore Section 672.708(2), which provides, "[i]f the measure of damages in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the Seller

7

would have made from full performance by the Buyer, together with any incidental damages provided in this chapter (s. 672.710), due allowance for costs reasonably incurred and due credit for payment or proceeds of resale."2  The Court agrees that this subsection of 672.708 applies because Validsa is a jobber or middleman that does not take possession of the goods it sells. *See TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 552 (6th Cir. 1981) (holding that Section 2-708(2) provides for recovery of lost profits for a "middleman" because recovery under Section 2-708(1), the difference between the contract price and the market price, "does not adequately compensate a middleman upon . . . repudiation."); *Nobs Chemical U.S.A., Inc. v. Koppers Co., Inc.*, 616 F.2d 212, 215 (5th Cir. 1980) (holding that Section 2-708(2) applies to parties, such as "jobbers", who never acquire the contract goods and whose decision not to acquire those goods, after learning of the breach, was commercially reasonable).

### 1.    Lost Profits on Repudiated Purchase Orders

To determine lost profits, Section 672.708(2) tells the Court to calculate "the profit (including reasonable overhead) which the Seller would have made from full performance by the Buyer." The official comment to Section 672.708 explains that the measure of "profit" discussed in subsection 2 "would be the list price less cost to the dealer . . ." Fla. Stat. § 672.708 cmt. n.2. *See also Automated Medical Laboratories., Inc. v. Armour Pharmaceutical Co.*, 629 F.2d 1118, 1125 (5th Cir. 1980) (finding that Section 672.708(2) entitled the Plaintiff seller to recover gross profits, which includes the net profit, "the contract price per liter minus direct costs" and overhead costs.); 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 7-13, n. 7 (5th ed. 2006) (noting the "jobber's measure of damages under 2-708(2) when it has no

---

2  Specifically, the parties stipulated: "Pursuant to Fla. Stat. § 672.708(2), Validsa is entitled to its provable lost profits, if any, including reasonable overhead, that it would have made had Defendants fully performed under Contracts 632 and 757, together with any incidental damages provided under Section 672.710, and due allowance for costs reasonably incurred." Am. Pretrial Stip. (D.E. 103), ¶¶ 7.c.

responsibility for delivery costs to buyer is gross profits with no reduction for overhead"); 67 Am. Jur. 2d *Sales* § 1007 (2009) ("The phrase 'profit (including reasonable overhead)' in [Section 2-708(2)] is intended to mean the equivalent of gross profit, which includes fixed costs, but not costs saved as a result of the breach."). The reasoning behind Section 672.708(2) is explained in *Mid-South Materials Co. v. Ellis*, No. 87-314-II, 1988 WL 23914, at *3 (Tenn. Ct. App. Mar. 16, 1988). The court in *Mid-South* stated, "[i]n the case of a middleman or jobber where there is no cost of delivery [the measure of damages] usually equals what we call gross profit: the jobber's markup, or, in the case of the middleman, the contract price less the middleman's costs of acquiring the goods." The Court agrees with the sound reasoning of these decisions. Accordingly, pursuant to Section 672.708(2), Validsa is entitled to recover its gross profits: the contract price per metric ton of beef or sugar less Validsa's direct costs, and by definition this calculation includes any overhead expenses.

Validsa bears the burden of proving its lost profits to a reasonable degree of certainty. *See HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 879 (11th Cir. 2005) ("Lost Profits must be established with a reasonable degree of certainty and must be the natural consequence of the wrong."). To prove lost profits under Florida law, Validsa must show the following: "1) the defendants' action caused the damage; and 2) there is some standard by which the amount of damages may be adequately determined." *Qantum Commc'ns Corp. v. Star Broad., Inc.*, 491 F. Supp. 2d 1123, 1130 (S.D. Fla. 2007); *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989) (same). According to Official Comment 2 to Section 672.708(2), "[i]t is not necessary to a recovery of 'profit' to show a history of earnings, especially if a new venture is involved." *See also W.W. Gay*, 545 So. 2d at 1351 ("A business can recover lost prospective profits regardless of whether it is established or has any 'track record.'").

9

### a.   Validsa's Lost Profits under Contract 757

Validsa's lost profit calculations were explained by Validsa's expert witness on damages, Alexander Fernandez ("Mr. Fernandez"). Mr. Fernandez calculated Validsa's profit under Contract 757 as the difference between the amount Defendants would have paid Validsa for the beef under the contract and the cost of the beef to Validsa from its supplier, QM. Mr. Fernandez relies on the quantity and price terms contained in Contract 757 and the QM contract. Mr. Fernandez multiplied the undelivered quantity of beef identified in Contract 757 (23,571.45 metric tons) by the contract price ($4,329.58 per metric ton), for a total of $102,054,457. Jan. 12, 2010 Trial Tr. 23:25-24:10. Mr. Fernandez then multiplied the undelivered quantity of beef identified in the QM contract (23,571.45 metric tons) by the QM contract price ($3,650 per metric ton), for a total of $86,035,774. *Id.* at 24:20-25. Thus, Mr. Fernandez contends that Validsa's lost profit on Contract 757 is $16,018,683, or the difference between the revenue it would have received ($102,054,457) and the beef supply costs it would have incurred ($86,035,774). *Id.* at 24:2-25:3.

Defendants, however, contend that Validsa's lost profit's calculation is not supported by the evidence. Defendants contend that Validsa assumes that the price charged by its supplier for beef ($3,650 per metric ton) would remain constant over the twelve-month delivery period specified in Contract 757, but that this is not the case. Defendants argue that Validsa's lost profits would have been negatively affected by a change in the cost of beef. Validsa's supply contract with QM provides that "[i]n the event any interruption of the shipments not attributable to seller, which causes the shipments to be postponed beyond October 31, 2008, the parties, by mutual agreement, shall determine if they will continue under the same conditions originally agreed, if any such conditions is [sic] to be modified, including the agreed price, or if the

Purchase Order is to be cancelled." Trial Ex. 19 (QM).  As the beef was not delivered by

October 31, 2008, Defendants argue that Validsa would have been forced to either re-negotiate

the terms of the QM contract to modify the price of beef from $3.650 per metric ton to $4,450

per metric ton, based on prevailing market conditions, or cancel the contract.

Defendants' argument is unpersuasive.  Both Contract 757 and the QM contract were

fixed priced contracts for a fixed quantity of beef.  No evidence was offered by Defendants in

support of its theory, as stated by Mr. Gonzalez that QM and Validsa ever agreed to any change

of price from that agreed in the contract.  Although QM did request a change of price in May

2008, this request was made because Validsa had paralyzed its performance following

Defendants' repudiation of Contract 757.  Jan. 11, 2010 Trial Tr. at 47:21-25; 50:7 – 51:6.

Further, there is no indication that Validsa would have agreed to this change.

Finally, Defendants attempted to challenge Mr. Fernandez's lost profit figures, arguing

they should be reduced by the amount of commissions that non-party, Naim Wakil, would have

allegedly received under Contract 757. Defendants contend that Mr. Gonzalez's deposition

testimony and interrogatory answers indicate a commission was owed.  The Court rejects this

argument.  Defendants presented evidence that Validsa paid commissions to Mr. Wakil for the

contracts it entered into in 2007 and therefore, by inference, Mr. Wakil was owed a commission

for this contract.  Defendants, however, presented no evidence that Validsa was under a

contractual obligation to pay Mr. Wakil a commission for *this* contract.  Mr. Gonzalez testified

that Validsa did not enter into any contracts or agreements to pay a commission to Mr. Wakil

under Contract 757.  This evidence is uncontradicted in the record.  The Court cannot rely on

circumstantial evidence of past commission payments to find a commission was due or fix a

commission amount.

In sum, Defendants attempted to challenge Mr. Fernandez's lost profits calculation under Contract 757 by assuming that QM would charge Validsa a higher price for beef under the QM Contract and Validsa would pay Mr. Wakil a commission in connection with Contract 757. As explained, the necessary underlying facts for these assumptions are not supported by the record. Accordingly, the Court finds that Validsa lost profits of $16,018,628.59 on Contract 757.

### b.    Validsa's Lost Profits under Contract 632

For Contract 632, Mr. Fernandez calculated Validsa's profit as the difference between the amount Defendants would have paid Validsa for the sugar under the contract and the cost of the sugar to Validsa from its supplier, PATC. Mr. Fernandez relied on the quantity and price terms contained in Contract 632 and the PATC contract. Mr. Fernandez multiplied the undelivered quantity of refined sugar identified in Contract 632 (100,000 metric tons) by the contract price ($446.92 per metric ton), for a total of 44,692,000.00. Jan. 12, 2010 Trial Tr. At 22:1 – 22:25. Mr. Fernandez calculated Validsa's profit under Contract 632 as the difference between the contract price amount of $44,692,000.00 and the cost amount agreed with the supplier in the PATC contract of $29,500,000.00. *Id.* The difference calculated by Mr. Fernandez is $15,192,000.00. *Id.*

Defendants contend that Validsa's alleged damages were not a natural consequence of Defendant's breach. Defendants cite to a letter Validsa wrote to PATC, dated May 20, 2008, indicating that Validsa was upset with PATC for its failure to deliver the sugar identified in Contract 632 by the agreed date of delivery. (May 20, 2008 Letter from Tomas Gonzalez to Patrick Parmater). Defendants assert that this would have led to a dispute that might have precluded Validsa from supplying the 100,000 tons of refined sugar called for under Contract 632.

12

The Court is not persuaded by this argument. The Court has already held that Defendants repudiated Contract 632. A party not in breach "is relieved of its duty to tender performance and has an immediate cause of action against the breaching party." *Hospital Mortgage Group v. First Prudential Dev. Corp.*, 411 So. 2d 181, 182 (Fla. 1982). Notwithstanding, while Validsa was relieved of its duty to tender performance, it still needs to demonstrate that its obligations "be performable." *Id.* "'[T]he willingness and ability to perform need not continue after the repudiation; it is merely required that they should have existed before the repudiation and that the Plaintiff would have rendered the agreed performance if the defendant had not repudiated.'" *Id.* at 183n* (quoting 4 Corbin A. on Contracts § 978).

Here, Validsa clearly demonstrated that at the time the repudiation occurred, Validsa had the willingness and ability to perform under Contract 632. Indeed, Defendants agree that Validsa had supply contracts in place with PATC for the sugar required under Contract 632 and Validsa had the necessary funding to perform under those supply contracts. There is nothing in the record to indicate that, based on this letter, Validsa would not have been able to perform its obligations under Contract 632 had Defendants not repudiated the contract. In fact, Mr. Gonzalez testified that "PATC was capable of supplying this quantity of sugar" (Jan. 11, 2010 Trial Tr. 122:15 – 123:24) and that Validsa had a perfect track record of completing all of its seven prior contracts with Defendants (*id.* at 31:17 – 32:1).

Further, the record demonstrates that any issues between PATC and Validsa arose in late May 2008. This is approximately one month after Defendants first repudiated Contracts 632 and after Validsa had taken steps to suspend performance, which it was entitled to do under Fla. Stat. § 672.609, upon issuance of its unsuccessful demand for adequate assurance. No evidence was presented showing that Validsa had any issues or problems with its suppliers prior to April 17,

2008, when Validsa requested adequate assurances, or prior to April 29, 2008, when Defendants repudiated Contracts 632. Jan. 11, 2010 Trial Tr. 32:17 – 24, 35:5 – 36. To the contrary, Mr. Gonzalez testified that on those dates, the supply contracts with PATC were in "good standing." *Id.* at 45.

In sum, there is no evidence to indicate that Validsa did not have the ability to perform as of the date of Defendants' repudiation of Contracts 632, and the Court finds Validsa has proven its ability to perform under the contracts. The Court finds that Plaintiff's lost profits on this contract are $15,192,000.

### 2. Costs Reasonably Incurred

Section 672.708(2) also allows the recovery of "costs reasonably incurred." These costs have been defined as "an amount equal to what he (the seller) has expended for performance of the contract that will now be valueless," *Nobs Chemical, U.S.A., Inc.*, 616 F.2d at 216, and as "variable costs . . . which may be identified to a specific contract and which, if the contract were not to be performed, could be avoided." *Neumiller Farms, Inc. v. Cornett*, 368 So. 2d 272, 277 (Ala. 1979). However, any costs that fall under this category would also qualify as Incidental Damages. Thus, all such costs will be discussed below in the section on incidental damages.

### C. Fla. Stat. § 672.210: Incidental Damages

Validsa also seeks direct and incidental damages under Fla. Stat. § 672.710, which provides: "[I]ncidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery . . . after the buyer's breach . . . or otherwise resulting from the breach." A seller is entitled to the full measure of damages from a breaching buyer under a contract for the sale of goods, including lost profits and incidental damages. In *Florida Recycling Services, Inc. v. Petersen Industries, Inc.*, 858 So. 2d 1114, 1116

(Fla. 2d DCA 2003), the court, in addition to awarding lost profits, awarded the seller the costs of having to undo modifications made to equipment at the buyer's request after the buyer's breach, noting that Fla. Stat. § 672.710 authorizes "reimbursement of the seller for expenses reasonably incurred by him as a result of the buyer's breach." The section "intends to allow all commercially reasonable expenditures made by the seller." Fla. Stat. § 672.710 cmt.  In this respect, Mr. Fernandez testified that the criteria he used to assess these expenditures was whether they were only incurred as a result of the breach and would not have been incurred but for the breach.  Jan. 12, 2010 Trial Tr. 20:1-17.

The Court has already found that Validsa was contractually obligated to pay its suppliers over $117 million to supply the goods covered under Contracts 632 and 757 at the time Defendants repudiated the contracts.  Because Validsa did not have alternate buyers, it was forced to cancel its supply contracts.  This led to legal threats from QM and actual litigation with PATC, Validsa's sugar supplier.  To avoid exposure for the contractual sums Validsa had agreed to pay its suppliers, Validsa settled.  Validsa's settlement costs constitute commercially reasonable expenses incurred by the seller as a result of the buyer's breach. *See, e.g., Union Carbide Corp. v. Consumers Power Co.*, 636 F. Supp. 1498, 1504 (E.D. Mich. 1986) (residual fuel oil seller's reduction payments to supplier to keep oil after buyer's breach were commercially reasonable expenses incurred by seller as a result of buyer's breach, and thus were "incidental damages" recoverable by seller); *see also Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 286 n.7 (3d Cir. 1993) (deadfreight charges incurred by seller to transport company by reason of the buyer's breach uniquely qualify as incidental damages under UCC § 2-710).

Moreover, as Mr. Gonzalez testified, after Defendants repudiated Contract 757, Validsa paid $2,000,000 to QM to maintain the QM Contract, to compensate QM for losses incurred by

the cancellation of Contract 757 and in the hope that dispute between Validsa and Defendants would be resolved and Validsa would continue to supply the beef to Defendants. Jan. 11, 2010 Trial Tr. 134:11 – 135:14. The Court finds that the $2,000,000 cost was expended by Validsa in connection with Contract 757 and would have been avoided but for the performance of Contract 757. Accordingly, Validsa is entitled to recover this amount under Section 672.710.

Thus, Validsa incurred the following incidental damages: i) $483,750.00 in settlement costs with its sugar supplier, PATC; and ii) $2,000,000.00 paid to QM in part to compensate QM for its expenses in undertaking to supply the beef and in an attempt by Validsa to keep the QM Contract intact while it attempted to resolve Defendants' repudiation of Contract 757.

### D.    Prejudgment Interest

Plaintiff seeks prejudgment interest for its damage claims on: (a) amounts that are due for goods delivered and accepted under Contracts 326, 368, 405, and 757; (b) lost profits it would have made had Defendants fully performed under Contracts 632 and 757; and (c) incidental damages suffered as a result of Defendants' breach. Stipulation, ¶ 8.a (amounts due for goods delivered), ¶ 8.b (lost profits on Contracts 632 and 757), and ¶ 8.f (incidental damages). Defendants contend that Plaintiff did not sustain any loss of the use of its own money since Plaintiff was holding advance payments from Defendants in its possession of $44,580,576. Defendants had paid these funds to Validsa on or before April 2, 2008, prior to the breach of contract, as advance payment under Contracts 632 and 757. Stipulation, ¶¶ 8.a, 8.b., and 8.c.

The legal authorities Plaintiff cites in support of its claim for prejudgment interest all require proof, by Plaintiff, of an actual loss or deprivation the parties suffered. *See Automated Med. Labs., Inc. v. Armour Pharm. Co.*, 629 F.2d 1118, 1126 (5th Cir. 1980) (affirming trial court's award of prejudgment interest, calculated under Fla. Stat. § 687.01, where the dates of

16

contract formation and breach were established, and the quantity sold and contract price were fixed); *Parker v. Brinson Constr. Co.*, 78 So. 2d 873, 874 (Fla. 1955) ("This Court has long recognized that in actions ex contractu it is proper to allow interest at the legal rate from the date the debt was due."); *Tech Corp. v. Permutit Co.*, 321 So. 2d 562, 563 (Fla. 4th DCA 1975) (holding that a seller under the Uniform Commercial Code is entitled to an award of prejudgment interest whenever a verdict liquidates a claim and fixes it as of a prior date). "Under the 'loss theory,' . . . neither the merit of the defense nor the certainty of the amount of loss affects the award of prejudgment interest. Rather, the loss itself is a wrongful deprivation by the defendant of plaintiff's property. Plaintiff is to be made whole from the date of the loss once a finder has determined the amount of damages and defendant's liability therefore." *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985). *See also Crockett v. State Farm Fire & Cas. Co.*, 849 F.2d 1369, 1371-2 (11th Cir. 1988) (quoting *Argonaut Ins., 474 So. 2d at 212*); *See also Broward Co. v. Finlayson*, 555 So. 2d 1211, 1213 (Fla. 1990) (Florida courts do not award prejudgment interest where it would be unfair or inequitable to do so) (citing *Flack v. Graham*, 461 So. 2d 82, 84 (Fla. 1984).

The law requires proof of an actual loss or deprivation of funds by Plaintiff, resulting in damages to Plaintiff. Plaintiff has failed to sustain its burden of proof that it paid its own funds (or was deprived of its own funds) during these contracts, justifying prejudgment interest.

Despite breach of several of its contracts, Plaintiff did not suffer damages on which it is entitled to recover prejudgment interest. Throughout the entirety of this litigation, Plaintiff has held $44,580,576 million of Defendant's money as advances received under Contracts 632 and

757.[3]  Plaintiff Validsa argues that this money, paid by Defendants on Contracts 632 and 757, should not apply to the liquidated sums due under Contracts 326, 368 and 405.

In *Argonaut*, the Florida Supreme Court noted that since at least the turn of the century, Florida has adopted the position that prejudgment interest is merely another element of pecuniary damages.  In doing so it rejected the alternative that Plaintiff would like the Court to reach today: that prejudgment interest should be awarded for Defendant's wrongful behavior in disputing a claim which it owed. *Argonaut*, 474 So. 2d. at 212.  The Court in *Argonaut* rejected the penalty theory, and stated,

> [t]o punish a defendant for failure to pay a sum which was not yet certain or which he disputed would be manifest injustice. But where the amount is certain and the defendant refuses to surrender it because of defenses determined to be meritless, the defendant may properly be punished for abuse of his privilege to litigate. Under the "loss theory," however, neither the merit of the defense nor the certainty of the amount of loss affects the award of prejudgment interest. Rather, the loss itself is a wrongful deprivation by the defendant of the plaintiff's property. Plaintiff is to be made whole from the date of the loss once a finder of fact has determined the amount of damages and defendant's liability therefore.

*Id.* at 215.  Under these facts, it would be unfair and inequitable to award Plaintiffs *any* prejudgment interest because Plaintiff's damages do not exceed the amount which it was advanced.  Plaintiff's proof establishes that it did not suffer an actual loss.  The record reflects that Validsa still retains possession of Defendant's $44,580,576 million advanced payments.

Plaintiff also argues that, since it asserted a separate breach of contract claim for each of the contracts at issue, each contract is a separate issue; and the advances under Contracts 632 and 757 should not therefore affect Validsa's right to prejudgment interest under Contracts 326, 368 or 405.  These five contracts were all between the same parties.  Contracts 632 and 757 were not

---

[3] In connection with these advances, the parties have stipulated and the Court notes that Validsa caused performance bonds to be issued in corresponding amounts to fully guarantee the advances in the event of a breach.

between Plaintiff and another completely different party defendant. If Contracts 632 and 757 were with Defendant "A" and the other three contracts were with Defendant "B," for example, an advance payment made by Defendant "A" should not be applied to credit the separate contract with Defendant "B." Defendant "B" made no advance payment and would get no credit (for payment made by another). However, the facts established at trial in this record are clear that Plaintiff was advanced these funds for future purchases on the five contracts it entered into with the same Defendant. Had Defendant breached one of the contracts, it could not have prevented Plaintiff from using Defendant's money in its control to off-set money it was owed under the other contracts. Money is fungible and as such there is no logical reason, and Plaintiff has advanced none other than to punish Defendant for its breach, to restrict the application of advance payments made under a particular contract to lost profits suffered under that contract. To do so would allow Plaintiff to recover a windfall, a result that the courts of Florida do not countenance. *See Broward Co. v. Finlayson*, 555 So. 2d 1211, 1213 (Fla. 1990) ("Interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable"). Applying these principles to the damages found in this case, the Court concludes that the prejudgment interest claim must be denied.

Plaintiff Validsa had received and was already in possession of the $44,580,576 in advances Defendants had paid on March 30, 2008 and April 2, 2008, when the $7,069,660 payment for goods received by Defendants became due. This Court's Order on Cross-Motions for Summary Judgment held that payment on completed deliveries was due seven days after receipt of the invoice. (D.E. #85 at 7). The parties have stipulated that there were multiple deliveries on these four contracts, and have stipulated to the invoice dates of those unpaid

deliveries. Trial Exs. 31-34 (Stipulated tables). Based on those stipulations, the Court concludes that the invoices on Contract 326 became payable on various dates beginning no earlier than April 11, 2008 (April 4 plus seven days; Trial Ex. 31); the invoices on Contract 368 became payable on various dates beginning no earlier than May 5, 2008 (April 28 plus seven days; Trial Ex. 32); the invoices on Contract 405 became payable no earlier than May 2, 2008 (April 25 plus seven days; Trial Ex. 33); and the invoice on Contract 757 became payable no earlier than May 30, 2008 (May 23 plus seven days; Trial Ex. 34). As to any amounts awarded for lost profits or incidental damages under either Contract 757 or Contract 632, in all cases those amounts would have become due, or were incurred, on dates after Plaintiff Validsa was already in possession of the $44,580,576 in advances.

### E.    Defendants' Entitlement to Setoff or Recoupment

Defendants claim that that they are entitled to setoff or recoupment for the approximately $44 million in advances that were paid to Validsa as part of Contracts 757 and 632. Validsa claims that Defendants have waived their right to setoff because they have not properly pleaded it. Although the issue did not appear in the Pretrial Stipulation, in their Answer Defendants asserted as a Tenth Affirmative Defense that "[a]s set forth in more detail in Bariven's Counterclaim, Plaintiff has received payments for amounts it claims are due, including over $44 million in advance payments under Contracts 757 and 632." *See* DE #39. This affirmative defense, together with the supplemental detail provided in Defendants' Counterclaims, adequately describes the payment and advances and seeks credit against the amounts due. Plaintiffs had timely and proper notice of this defense.

Moreover, courts have broad powers in equity to prevent a windfall judgment. *See, e.g., Circle Finance v. Peacock*, 399 So. 2d 81, 84 (Fla. 1981). In Validsa's calculation of its

damages, it appropriately takes into account the fact that advances were paid. However, for Contract 757, where the advances exceed the damages by roughly $13 million, Validsa does not account for that remaining $13 million, but would rather have it disappear into Validsa's account. This is not an appropriate resolution for those funds; in fact, those funds will be credited against any recovery to which Validsa is entitled. Indeed, in light of the fact that Plaintiff's maximum recovery in this case is less than the amount of Defendants' advance payments, an inequitable windfall would result if the Court failed to credit advance payments against the amount of the judgment to which Plaintiff is entitled. Therefore, Defendants are entitled to an appropriate setoff.

## III.    CONCLUSION

In sum, the Court finds that Validsa is entitled to the following amounts in damages:

i)   **$1,551,331.00** for the amounts due and outstanding under Contract 326;

ii)   **$4,157,020.56** for the amounts due and outstanding under Contract 368;

iii)   **$62,487.95** for the amounts due and outstanding under Contract 405;

iv)   **$15,675,750.00** equaling $483,750 for incidental damages and $15,192,000 for lost profits under Contract 632; and

v)   **$19,317,503.77** equaling $1,298,821.18 for goods delivered, $2,000,000 for incidental damages and $16,018,682.59 for lost profits under Contract 757.

In total, Validsa suffered **$40,764,093.30** in damages. After considering the **$44,580,576.00** in advances that Defendants paid Validsa, the Court finds that Defendants are entitled to recover **$3,816,482.70**.

To the extent that any findings of fact are deemed to be conclusions of law, they are incorporated herein as conclusions of law. Conversely, to the extent that any conclusions of law are deemed to be findings of fact, they are incorporated herein as findings of fact.

In accordance with the foregoing, it is

**ORDERED, ADJUDGED** and **DECREED** that:

Defendants Bariven, S.A., and PDVSA Services, Inc., recover from Plaintiff Validsa the amount of **$3,816,482.70** which will be entered by final judgment.

DONE AND ORDERED in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 29th day of January, 2010.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

Copies furnished to:

**Counsel for Plaintiff Validsa, Inc.:**
George Mencio, Esq.
Adolfo E. Jiménez, Esq.
Brian A. Briz, Esq.
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, Florida 33131

**Counsel for Defendants PDVSA Services Inc. and Bariven S.A.:**
Brian M. Silverio, Esq.
Silverio & Hall, P.A.
150 West Flagler Street
Penthouse - 2850
Miami, Florida 33130

Anthony D. Mirenda, Esq.
Neil Austin, Esq.
Thomas J. Bone, Esq.
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2600

Ronald E.M. Goodman, Esq.
Janis H. Brennan, Esq.
FOLEY HOAG LLP
1875 K Street NW
Washington, D.C. 20006-1238